**NATIONAL LEAGUE OF PROFESSIONAL BASEBALL CLUBS et al. v. FEDERAL BASEBALL CLUB OF BALTIMORE, Inc.**

(Court of Appeals of District of Columbia. Submitted October 12, 1920. Decided December 6, 1920. On Motion for Rehearing, January 3, 1921.)

No. 3368.

1. Monopolies ⊜⇒12(2)—"Trade" and "commerce" involve transfer of goods, persons, or intelligence.

Within the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), making unlawful restraint of trade or commerce among the several states. "trade," which is defined as the exchange of commodities or the buying and selling of commodities, and "commerce," which means exchange of goods both trade and commerce involve the transfer of something, whether it be persons, commodities, or intelligence, from one place or person to another.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Commerce; Trade.]

2. Monopolies ⊜⇒12(2)—Baseball club is not engaged in "trade" or "commerce."

The business of giving exhibitions of baseball games for profit is not trade or commerce, within the meaning of the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), and a corporation formed for the purpose of giving such exhibitions is not engaged in such trade or commerce, though as an incident thereto it transports the players and their paraphernalia from one state to another.

3. Monopolies ⊜⇒12(1)—Persons not engaged in commerce may be guilty of interfering with commerce.

A baseball club, even though not engaged in interstate commerce, may be guilty of violating the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830), if it illegally interferes with the interstate features of the business of another club.

4. Monopolies ⊜⇒12(2)—Sherman Act prohibits only direct restraints of interstate commerce.

The Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830) does not apply, unless the effect of the act complained of on interstate commerce is direct, not merely indirect or incidental.

5. Monopolies ⊜⇒12(1)—Reserve clause in baseball players' contracts is not direct restraint of commerce.

The reserve clause in baseball players' contracts under the National Agreement was intended to protect the rights of clubs operating under that agreement to retain the services of sufficient players for their purposes, and its effect on the interstate commerce of a club outside the National Agreement was only indirect and incidental, so that it does not amount to a violation of the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830).

On Motion for Rehearing.

6. Appeal and error ⊜⇒1176(1)—Defendants in error on request given final judgment against it, instead of new trial, to permit further appeal without delay.

After a case has been reversed and remanded for new trial, a petition by defendant in error, plaintiff in the suit, stating it does not desire to present new testimony, but is willing to stand on the record made, and prefers a decision directing judgment against it, so that it may appeal to the Supreme Court without further delay, should be granted.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Appeal from the Supreme Court of the District of Columbia.

Action by the Federal Baseball Club of Baltimore, Incorporated, against the National League of Professional Baseball Clubs and others. Judgment for plaintiff, and defendants appeal. Reversed and remanded on rehearing, with directions to enter judgment for defendants.

B. S. Minor, of Washington, D. C., and George Wharton Pepper, of Philadelphia, Pa. (Samuel M. Clement, Jr., of Philadelphia, Pa., on the brief), for appellants.

Chas. A. Douglas and J. V. Morgan, both of Washington, D. C., and Wm. L. Marbury, Wm. L. Rawls, and L. Edwin Goldman, all of Baltimore, Md. (Charles S. Douglas and Hugh H. Obear, both of Washington, D. C., on the brief), for appellee.

SMYTH, Chief Justice. This is an action for damages under the Sherman Anti-Trust Act (26 Stat. 209 [Comp. St. §§ 8820–8823, 8827–8830]). The plaintiff, who is appellee here, was awarded a verdict for $80,000, which was trebled under section 7 of the act, and a judgment for $240,000, with costs and attorney's fees, entered against the defendants, who bring the case before us for review.

Appellee is a corporation organized in October, 1913, in Baltimore, for the purpose of giving exhibitions of baseball. Its organization was brought about by the Federal League of Professional Baseball Clubs, which was incorporated in March, 1913, and consisted of eight clubs, of which the appellee was one. One club was located in each of the following cities: Brooklyn, Pittsburgh, Buffalo, Baltimore, St. Louis, Kansas City, Indianapolis, and Chicago. The league issued to each club a franchise, that authorized it to conduct competitive baseball games in the league. The league continued in existence, with more or less success, until December, 1915, when an agreement, called the "Peace Agreement," was entered into between it, the National League, and the American League of Professional Baseball Clubs. This agreement resulted in the dissolution of the Federal League and all its constituent clubs, save the appellee. The latter refused to become a party to the agreement; but, as there was none of its league clubs left after the dissolution with which to compete, it ceased to operate. Appellee, asserting that the disbandment of the league and the consequent injury to it were due to acts of the appellants done in violation of sections 1 and 2 of the Sherman Act, instituted this action.

The appellants, defendants below, are: The National League of Professional Baseball Clubs, referred to herein as the National League, an unincorporated association, and its eight incorporated constituent clubs, one of which was established in each of the following cities: New York City, Brooklyn, Philadelphia, Boston, Chicago, St. Louis, Pittsburgh, and Cincinnati. Also the American League of Professional Baseball Clubs, spoken of hereafter as the American League, an unincorporated association, and, like the National League, having eight constituent clubs, one located in each of these cities: New York City, Boston, Philadelphia, Washington, D. C., Chicago, St. Louis, Detroit,

and Cleveland.   Also John K. Tener, president of the National League;
Bancroft A. Johnson, president of the American League; and August
Herrmann, chairman of the National Commission, hereafter described.
The cities having National League clubs form the baseball circuit for
that league, and those having American League clubs the baseball
circuit for that league.

The National League and the American League are generally de-
nominated major leagues.   With them are united, by what is called
the "National Agreement," the National Association of Professional
Baseball Leagues, which consists of a large number of minor leagues
of professional baseball, similar in structure to the major leagues,
but the players have not, in general, attained as high a degree of skill
as that which characterizes major league players.   The leagues of the
association constitute training fields from which the major leagues
draw new players.   While the association covers the greater part of
the field of professional baseball below the major league grades, yet
there are outside of it some professional, many semiprofessional, and
all college and amateur organizations.

Each club of the major leagues obtained a ball ground and equipped
it with stands and seats for the accommodation of the public in its
home city.   The clubs were organized for profit, but not the leagues.
The function of each league was to regulate contests between teams
representing the several clubs in the league, which compete annually
for championship.   Baseballs were purchased by each league and sold
to its clubs at cost, and each league had a contract with a telegraph
company for service, and had an income sufficient only to meet nec-
essary expenses.   Such unspent funds as it might have were not held
for distribution, but as a reserve to meet liabilities.

The National Commission, already referred to, is an unincorporated
body composed of the presidents of the two leagues and a third person,
selected by them.   It is an administrative body, and is not a profit-
making concern.   The club which wins the championship pennant in
any year in one major league competes for the world's championship
in that year with the winner of the pennant in the other.   It is one of
the functions of the National Commission to regulate these contests.
A schedule for each league is arranged by its president prior to the
beginning of the playing season.   During the playing season teams
travel by train from place to place, taking with them their uniforms
and other paraphernalia of the game.

The National Commission exists by virtue of the National Agree-
ment, heretofore referred to.   It is claimed that this agreement has
produced the system which constitutes the violation of the Sherman
Act complained of.   By this agreement players, before they could se-
cure employment in any club operating under it, were required to en-
ter into contracts which, it is alleged, gave the appellants control over
practically all available players of sufficient skill to serve in a major
league club, and thus the Federal League was unable to secure players
capable of producing such exhibitions of baseball as the public de-
manded; and, in consequence of this inability, disaster came upon the
Federal League and its constituent clubs, including the appellee.

The court instructed the jury: (a) That appellants were engaged in interstate commerce; (b) that they attempted to monopolize, and did monopolize, a part of that commerce, principally through what is called the "reserve clause" and ineligible list features of certain agreements; but (c) left it to the jury to say whether the appellants had conspired together to destroy, and did destroy, the Federal League, to the end that they might perfect their monopoly of professional baseball, and whether, if they did so conspire with the effect stated, their act resulted in injury to the appellee.

Did the giving of exhibitions of baseball, under the circumstances disclosed in the record, constitute trade or commerce within the meaning of the Sherman Act? If it did not, then the act does not apply, and the appellee has no right to invoke its provisions.

[1] The Sherman Act, in section 1, declares every contract, combination, or conspiracy "in restraint of trade or commerce among the several states * * * to be illegal," and, in section 2, condemns every person who shall monopolize, or attempt to monopolize, or combine with others to monopolize, that trade or any part thereof. "The word 'trade,' in its broadest signification, includes, not only the business of exchanging commodities by barter, but the business of buying and selling for money, or commerce and traffic generally." · May v. Sloan, 101 U. S. 231, 237 (25 L. Ed. 797). It means "the buying as well as the selling of property." United States v. United States Steel Corporation et al. (D. C.) 223 Fed. 55, 177. Webster's Dictionary defines trade as "the act or business of exchanging commodities by barter; the business of buying and selling for money; commerce; traffic; barter"—and says that "Commerce, in its simplest signification, means exchange of goods. * * * It may be said to be trade, traffic, or exchange between different places and communities." And according to the Century Dictionary, commerce is defined as "interchange of goods, merchandise or property of any kind; trade; traffic." "Commerce, briefly stated, is the sale or exchange of commodities." United States v. Swift & Co. (C. C.) 122 Fed. 529. Substantially the same definitions are given in the cases of United States v. E. C. Knight Co., 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325; Gibbons v. Ogden, 9 Wheat, 1, 189, 190, 6 L. Ed. 23; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 196, 5 Sup. Ct. 826, 29 L. Ed. 158; In re Charge to Grand Jury (D. C.) 151 Fed. 834.

Through these definitions runs the idea that trade and commerce require the transfer of something, whether it be persons, commodities, or intelligence, from one place or person to another. The concomitant of this concept is the principle, approved by the Supreme Court of the United States, that "importation into one state from another is the indispensable element, the test, of interstate commerce." International Text-Book Co. v. Pigg, 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. 678, 27 L. R. A. (N. S.) 493, 18 Ann. Cas. 1103.

[2] The business in which the appellants were engaged, as we have seen, was the giving of exhibitions of baseball. A game of baseball is not susceptible of being transferred. The players, it is true, travel from place to place in interstate commerce, but they are not the game.

Not until they come into contact with their opponents on the baseball field and the contest opens does the game come into existence. It is local in its beginning and in its end. Nothing is transferred in the process to those who patronize it. The exertions of skill and agility which they witness may excite in them pleasurable emotions, just as might a view of a beautiful picture or a masterly performance of some drama; but the game effects no exchange of things according to the meaning of "trade and commerce" as defined above.

The transportation in interstate commerce of the players and the paraphernalia used by them was but an incident to the main purpose of the appellants, namely, the production of the game. It was for it they were in business—not for the purpose of transferring players, balls, and uniforms. The production of the game was the dominant thing in their activities. In Hooper v. California, 155 U. S. 648, 15 Sup. Ct. 207, 39 L. Ed. 297, the Supreme Court of the United States was asked to hold that, because an insurance corporation, in effecting a marine insurance policy, used some of the instrumentalities of commerce, it was engaged in that commerce; but the court refused to yield to the argument, and said:

"It ignores the real distinction upon which the general rule and its exceptions are based, and which consists in the difference between interstate commerce, or an instrumentality thereof, on the one side, and the mere incidents which may attend the carrying on of such commerce on the other."

And the court held that the business of marine insurance was not commerce, irrespective of the fact that some of its incidents were. Consult, also, Paul v. Virginia, 75 U. S. (8 Wall.) 168, 19 L. Ed. 357; New York Life Insurance Co. v. Cravens, 178 U. S. 389, 20 Sup. Ct. 962, 44 L. Ed. 1116. So, here, baseball is not commerce, though some of its incidents may be.

Suppose a law firm in the city of Washington sends its members to points in different states to try lawsuits; they would travel, and probably carry briefs and records, in interstate commerce. Could it be correctly said that the firm, in the trial of the lawsuits, was engaged in trade and commerce? Or, take the case of a lecture bureau, which employs persons to deliver lectures before Chautauqua gatherings at points in different states. It would be necessary for the lecturers to travel in interstate commerce, in order that they might fulfill their engagements; but would it not be an unreasonable stretch of the ordinary meaning of the words to say that the bureau was engaged in trade or commerce? If a game of baseball, before a concourse of people who pay for the privilege of witnessing it, is trade or commerce, then the college teams, who play football where an admission fee is charged, engage in an act of trade or commerce. But the act is not trade or commerce; it is sport. The fact that the appellants produce baseball games as a source of profit, large or small, cannot change the character of the games. They are still sport, not trade.

It has been ruled that the production of grand opera at points in different states according to a prearranged schedule involves "none of the elements of trade or commerce as commonly understood." Metropolitan Opera Co. v. Hammerstein, 162 App. Div. 695, 147 N.

Y. Supp. 535. "Such a transaction," said the court, "is as far removed as possible from the commonly accepted meaning of trade and commerce." In another case it was held that the skill of theatrical players which attracts the public "is not sold; it is merely exhibited for hire;" and the fact that the producing corporation "must buy scenery and stage appliances and furniture, which it may afterwards sell again, is of no importance" in determining whether or not the corporation was engaged in trade or commerce. In re Oriental Society, Bankrupt (D. C.) 104 Fed. 975. As supporting the same principle, see People v. Klaw (Gen. Sess.) 106 N. Y. Supp. 341, American Baseball Club of Chicago v. Chase, 86 Misc. Rep. 441, 149 N. Y. Supp. 6, Minnesota v. Duluth Board of Trade, 107 Minn. 506, 121 N. W. 395, 23 L. R. A. (N. S.) 1260, Rohlf v. Kasemeier, 140 Iowa, 182, 118 N. W. 276, 23 L. R. A. (N. S.) 1284, and State v. Frank, 114 Ark. 47, 169 S. W. 333, 52 L. R. A. (N. S.) 1149, Ann. Cas. 1916D, 983. In the American Baseball Club Case the precise question we are considering was passed upon in a carefully prepared opinion, and it was held that the production of exhibitions of baseball did not constitute trade or commerce. The National Agreement, the rules and regulations adopted pursuant to it, and the players' contracts, complained of in this suit, were all considered by the court in reaching its conclusion.

Much stress is laid by the appellee upon Marienelli v. United Booking Offices (D. C.) 227 Fed. 165, and International Text-Book Co. v. Pigg, supra; but we think they are not in point. In the first case the combination was between a series of theaters and persons engaged in theatrical brokerage, according to which the brokers had the exclusive right of acting for the theaters in booking performances on an interstate schedule. The entire business consisted in the negotiation of a contract to travel and perform. The brokers were not interested in the service rendered or the skill exhibited by the performers. The court stressed this feature, and distinguished the case before him from the Hammerstein Case, supra, by saying that the trade and commerce element in the case he was considering was essential, while that element in the Hammerstein Case was but incidental. For the same reason the Marienelli Case is distinguishable from the case before us. In the Pigg Case the chief element was the communication of intelligence through instrumentalities of commerce.

[3] This brings us to consider whether or not the restrictions, which appellee says resulted in the monopolization denounced by the statute, affected illegally the interstate features of appellee's business, that is, the movement of its players and those of the other clubs of the Federal League and their paraphernalia from place to place in the league's circuit; for it is well settled that persons not engaged in interstate commerce may be guilty of violating the statute by illegally interfering with those who are so engaged. Loewe v. Lawlor, 208 U. S. 274, 297, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; United States v. Trans-Missouri Freight Association, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007; Northern Securities Co. v. United States, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679.

[4] The statute does not apply "where the trade or commerce af--

fected is interstate, unless the effect thereon is direct, not merely indirect." United States v. Patten, 226 U. S. 525, 542, 33 Sup. Ct. 141, 145 (57 L. Ed. 333, 44 L. R. A. [N. S.] 325). If the necessary effect is but incidentally or indirectly to restrict the commerce, "while its chief result is to foster the trade and increase the business of those who make and operate it, it is not violative of this law." United States v. Standard Oil Co. (C. C.) 173 Fed. 177, 188; Hopkins v. United States, 171 U. S. 578, 592, 19 Sup. Ct. 40, 43 L. Ed. 290; Anderson v. United States, 171 U. S. 604, 618, 19 Sup. Ct. 50, 43 L. Ed. 300; United States v. Joint Traffic Association, 171 U. S. 505, 568, 19 Sup. Ct. 25, 43 L. Ed. 259; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 244, 20 Sup. Ct. 96, 44 L. Ed. 136.

[5] Generally speaking, every player was required to contract with his club that he would serve it for one year, and would enter into a new contract "for the succeeding season at a salary to be determined by the parties to such contract." The quoted part is spoken of as the "reserve clause," and it is found, in effect, in the contracts of the minor league players, as well as in those of the major league players. For his services each player was given a certain consideration, and for consenting to the reserve clause another consideration, both of which were set forth in his contract. It is provided in the rules adopted by the leagues and in the National Agreement that, if a player violates the reserve clause, is guilty of "contract-jumping," he shall be punished by being treated as ineligible to serve in any club of the leagues until he has been formally reinstated, and a list of such ineligible players is kept by the leagues.

The number of players which each club was permitted to employ was limited to 22. It is admitted that this was a reasonable number, and that none of the clubs retained more players than it needed. The number of skilled players available did not equal the demand, and clubs within the appellant leagues were competing among themselves for first-class players. One of the directors of the appellee admitted that, if his club had to compete for public favor with the appellants, it undoubtedly would have been driven to the ranks of the latter for many of its players. If the reserve clause did not exist, the highly skillful players would be absorbed by the more wealthy clubs, and thus some clubs in the league would so far outstrip others in playing ability that the contests between the superior and inferior clubs would be uninteresting, and the public would refuse to patronize them. By means of the reserve clause and provisions in the rules and regulations, said one witness, the clubs in the National and American Leagues are more evenly balanced, the contests between them are made attractive to the patrons of the game, and the success of the clubs more certain. The reserve clause and the publication of the ineligible lists, together with other restrictive provisions, had the effect of deterring players from violating their contracts, and hence the Federal League and its constituent clubs, of which the appellee was one, were unable to obtain players who had contracts with the appellants; in other words, these things had the intended effect, viz. of preventing players from disregarding their obligations. On these provisions, all having for

their purpose the preservation by each club of its necessary quota, and no more, of players, rests the gravamen of appellee's case. It must be obvious that the restrictions thus imposed relate directly to the conservation of the personnel of the clubs, and did not directly affect the movement of the appellee in interstate commerce. Whatever effect, if any, they had, was incidental, and therefore did not offend against the statute.

There are many other questions raised by the record, but it is not necessary for us to consider them.

The judgment must be, and it is, reversed, at the cost of the appellee, and the case is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

### On Motion for Rehearing.

A petition for rehearing and for modification of the judgment of the court has been filed by the appellee. It appears therefrom that the appellee does not desire to present additional testimony, nor does it wish a new trial, but is willing to stand on the record as made, and that it prefers, instead of a ruling granting a new trial, a decision reversing the judgment of the lower court and directing that court to enter judgment for the appellants, in order that it may carry the case to the Supreme Court of the United States without further delay. We think the petition should be granted. Union Castle Mail S. S. Co. v. Thomsen, 190 Fed. 536, 111 C. C. A. 368; Id., 243 U. S. 66, 37 Sup. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322.

The judgment, therefore, of this court, entered on December 6, 1920, is hereby vacated, and the judgment of the Supreme Court of the District of Columbia is reversed, at the cost of the appellee, and this cause is remanded to the Supreme Court of the District, with instructions to enter a judgment for the appellants.

Reversed and remanded.