## TOOLSON *v.* NEW YORK YANKEES, INC. ET AL.

NO. 18.

Argued October 13, 1953.—Decided November 9, 1953.

*Howard C. Parke* argued the cause for petitioner in No. 18. With him on the brief was *Gene M. Harris.*

*Frederic A. Johnson* argued the cause for petitioner in No. 23 and *Seymour Martinson* argued the cause for petitioners in No. 25. With them on the briefs were *Maurice H. Koodish* and *Edward Martinson.*

*Norman S. Sterry* argued the cause and filed a brief for respondents in No. 18.

*Raymond T. Jackson* argued the cause for respondents in Nos. 23 and 25. With him on the briefs were *Benjamin F. Fiery* and *Louis F. Carroll.*

*Thomas Reed Powell* filed a brief for the Boston American League Base Ball Company in No. 18, as *amicus curiae,* urging affirmance.

PER CURIAM.

In *Federal Baseball Club of Baltimore* v. *National League of Professional Baseball Clubs,* 259 U. S. 200

(1922), this Court held that the business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws. Congress has had the ruling under consideration but has not seen fit to bring such business under these laws by legislation having prospective effect. The business has thus been left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation. The present cases ask us to overrule the prior decision and, with retrospective effect, hold the legislation applicable. We think that if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation. Without re-examination of the underlying issues, the judgments below are affirmed on the authority of *Federal Baseball Club of Baltimore* v. *National League of Professional Baseball Clubs, supra,* so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws.

*Affirmed.*

MR. JUSTICE BURTON, with whom MR. JUSTICE REED concurs, dissenting.

Whatever may have been the situation when the *Federal Baseball Club* case [1] was decided in 1922, I am not able to join today's decision which, in effect, announces that organized baseball, in 1953, still is not engaged in interstate trade or commerce. In the light of organized baseball's well-known and widely distributed capital investments used in conducting competitions between teams constantly traveling between states, its receipts and expenditures of large sums transmitted between states, its numerous purchases of materials in interstate commerce,

---

[1] *Federal Baseball Club* v. *National League,* 259 U. S. 200.

the attendance at its local exhibitions of large audiences often traveling across state lines, its radio and television activities which expand its audiences beyond state lines, its sponsorship of interstate advertising, and its highly organized "farm system" of minor league baseball clubs, coupled with restrictive contracts and understandings between individuals and among clubs or leagues playing for profit throughout the United States, and even in Canada, Mexico and Cuba, it is a contradiction in terms to say that the defendants in the cases before us are not now engaged in interstate trade or commerce as those terms are used in the Constitution of the United States and in the Sherman Act.[2]

In 1952 the Subcommittee on Study of Monopoly Power, of the House of Representatives Committee on the Judiciary, after extended hearings, issued a report dealing with organized baseball in relation to the Sherman Act. In that report it said:

> " 'Organized baseball' is a combination of approximately 380 separate baseball clubs, operating in 42 different States, the District of Columbia, Canada, Cuba, and Mexico . . . .
>
> "Inherently, professional baseball is intercity, intersectional, and interstate. At the beginning of the 1951 season, the clubs within organized baseball were divided among 52 different leagues. Each league is an unincorporated association of from 6 to 10 clubs which play championship baseball games among

---

[2] Compare *Paul* v. *Virginia*, 8 Wall. 168, and *Hooper* v. *California*, 155 U. S. 648, with *United States* v. *South-Eastern Underwriters Assn.*, 322 U. S. 533, and *Lorain Journal Co.* v. *United States*, 342 U. S. 143. See also, *Times-Picayune Publishing Co.* v. *United States*, 345 U. S. 594; *United States* v. *National Assn. of Real Estate Boards*, 339 U. S. 485; *United States* v. *Crescent Amusement Co.*, 323 U. S. 173; *American Medical Assn.* v. *United States*, 317 U. S. 519.

themselves according to a prearranged schedule. Such a league organization is essential for the successful operation of baseball as a business.

. . . . .

"Of the 52 leagues associated within organized baseball in 1951, 39 were interstate in nature." [3]

---

[3] H. R. Rep. No. 2002, 82d Cong., 2d Sess. 4, 5.

"The primary sources of revenue for baseball clubs are admissions, radio and television, and concessions. The following table indicates the combined revenue of the 16 major-league clubs from these sources for the years 1929, 1939, and 1950.

*"Major league revenue*
"[In thousands of dollars]

| "Source of revenue | 1929 [1] | 1939 | 1950 |
|---|---|---|---|
| Home games...................... | 6,559.1 | 6,766.6 | 18,334.8 |
| Road games...................... | 2,221.4 | 2,320.2 | 4,517.8 |
| Exhibition games................ | 422.6 | 515.7 | 911.5 |
| Radio and television............ | 0 | 884.5 | 3,365.5 |
| Concessions (net)............... | 582.8 | 850.3 | 2,936.3 |
| Other .......................... | 733.4 | 776.0 | 1,969.6 |
| Gross receipts.............. | 10,519.5 | 12,113.3 | 32,035.5 |

"[1] Data unavailable for 2 clubs: Chicago, American League; and Pittsburgh, National League.

. . . . .

"The fastest-growing source of revenue for major league clubs is radio and television. Receipts from these media of interstate commerce were nonexistent in 1929. In 1939, 7.3 percent of the clubs' revenue came from this source; and in 1950, this share rose to 10.5 percent.

"Portrayed in absolute terms, the growing importance of radio and television becomes even more pronounced. Receipts rose from nothing in 1929 to $884,500 in 1939 and $3,365,500 in 1950. Reported income from primary radio and television contracts for 1951 indicate that this sharp increase is continuing. . . . To this must be added $110,000 for the sale of radio and television rights to the 1951 all-star game and $1,075,000 for the sale of similar rights to the 1951 world series." *Id.*, at 5–6.

In the *Federal Baseball Club* case the Court did not state that even if the activities of organized baseball amounted to interstate trade or commerce those activities were exempt from the Sherman Act. The Court acted on its determination that the activities before it did not amount to interstate commerce. The Court of Appeals for the District of Columbia, in that case, in 1920, described a major league baseball game as "local in its beginning and in its end." [4] This Court stated that "The business is giving exhibitions of base ball, which are purely state affairs," and the transportation of players and equipment between states "is a mere incident . . . ." [5] The main thrust of the argument of counsel for organized baseball, both in the Court of Appeals and in this Court, was in support of that proposition.[6] Although counsel did argue that the activities of organized baseball, even if amounting to interstate commerce, did not violate the Sherman Act,[7] the Court significantly refrained from expressing its opinion on that issue.

That the Court realized that the then incidental interstate features of organized baseball might rise to a magnitude that would compel recognition of them independently is indicated by the statement made in 1923 by Mr. Justice Holmes, the writer of the Court's opinion in the *Federal Baseball Club* case. In 1923, in considering a bill in equity alleging a violation of the Sherman Act by parties presenting local exhibitions on an interstate vaudeville circuit, the Court held that the bill should be considered on its merits and, in writing for the Court,

[4] *National League* v. *Federal Baseball Club,* 50 App. D. C. 165, 169, 269 F. 681, 685.

[5] 259 U. S., at 208, 209.

[6] See brief for appellants in the Court of Appeals, pp. 45–67; brief for defendants in error in this Court, pp. 45–66.

[7] See brief for appellants in Court of Appeals, pp. 68–72; brief for defendants in error in this Court, pp. 66–72.

Mr. Justice Holmes said "The bill was brought before the decision of the *Base Ball Club Case*, and it may be that what in general is incidental, in some instances may rise to a magnitude that requires it to be considered independently." [8]

The 1952 report of the Congressional Subcommittee previously mentioned also said:

> "Under judicial interpretations of this constitutional provision [the commerce clause], the Congress has power to investigate, and pass legislation dealing with professional baseball, or more particularly 'organized baseball,' if that business is, or affects, interstate commerce.
>
> .     .     .     .     .
>
> "After full review of all of the foregoing facts and with due consideration of modern judicial interpretation of the scope of the commerce clause, it is the studied judgment of the Subcommittee on the Study of Monopoly Power that the Congress has jurisdiction to investigate and legislate on the subject of professional baseball."   H. R. Rep. No. 2002, 82d Cong., 2d Sess. 4, 7, and see 111–139.[9]

---

[8] *Hart* v. *Keith Vaudeville Exchange*, 262 U. S. 271, 274, and see *North American Co.* v. *S. E. C.*, 327 U. S. 686, 694.

[9] In opposing approval of four exclusionary bills then pending, the Subcommittee did not take the stand that organized baseball and other comparable sports, although constituting interstate trade or commerce, already are exempt from the broad coverage of the Sherman Act.  On the contrary, it said:

"Four bills have been introduced in the Congress, three in the House, one in the Senate, intending to give baseball and all other professional sports a complete and unlimited immunity from the antitrust laws.  The requested exemption would extend to all professional sports enterprises and to all acts in the conduct of such enterprises.  The law would no longer require competition in any facet of business activity of any sport enterprise.  Thus the sale

In cases Nos. 18 and 23 the plaintiffs here allege that they are professional baseball players who have been damaged by enforcement of the standard "reserve clause" in their contracts pursuant to nationwide agreements among the defendants.[10]   In effect they charge that in

of radio and television rights, the management of stadia, the purchase and sale of advertising, the concession industry, and many other business activities, as well as the aspects of baseball which are solely related to the promotion of competition on the playing field, would be immune and untouchable.   Such a broad exemption could not be granted without substantially repealing the antitrust laws."   *Id.*, at 230.

[10] "The reserve clause is popularly believed to be some provision in the player contract which gives to the club in organized baseball which first signs a player a continuing and exclusive right to his services.   Commissioner Frick testified that this popular understanding was essentially correct.   He pointed out, however, that the reserve clause is not merely a provision in the contract, but also incorporates a reticulated system of rules and regulations which enable, indeed require, the entire baseball organization to respect and enforce each club's exclusive and continuous right to the services of its players." H. R. Rep. No. 2002, 82d Cong., 2d Sess. 111.   See also, Section VII, The Reserve Clause, *id.*, at 111–139, and *Gardella* v. *Chandler*, 172 F. 2d 402.

In No. 18 the following specific allegations appear and those in No. 23 are comparable:

"XI.

"That the Defendants, and each of them, have entered into or agreed to be bound by a contract in the restraint of Interstate Commerce; that said contract is designated as the Major-Minor League Agreement, dated December 6, 1946, and provides in effect that:

"1. All players' contracts in the Major Leagues shall be of one form and that all players' contracts in the Minor Leagues shall be of one form.

"2. That all players' contracts in any league must provide that the Club or any assignee thereof shall have the option to renew the player's contract each year and that the player shall not play for any other club but the club with which he has a contract or the assignee thereof.

"3. That each club shall, on or before a certain date each year, designate a reserve list of active and eligible players which it desires

violation of the Sherman Act, organized baseball, through its illegal monopoly and unreasonable restraints of trade, exploits the players who attract the profits for the benefit of the clubs and leagues. Similarly, in No. 25, the

to reserve for the ensuing year. That no player on such a reserve list may thereafter be eligible to play for any other club until his contract has been assigned or until he has been released.

"4. That the player shall be bound by any assignment of his contract by the club, and that his remuneration shall be the same as that usually paid by the assignee club to other players of like ability.

"5. That there shall be no negotiations between a player and any other club from the one which he is under contract or reservation respecting employment either present or prospective unless the Club with which the player is connected shall have in writing expressly authorized such negotiations prior to their commencement.

"6. That in the case of Major League players, the Commissioner of Baseball and in the case of Minor League players, the President of the National Association, may determine that the best interests of the game require a player to be declared ineligible and, after such declaration, no club shall be permitted to employ him unless he shall have been reinstated from the ineligible list.

"7. That an ineligible player whose name is omitted from a reserve list shall not thereby be rendered eligible for service unless and until he has applied for and been granted reinstatement.

"8. That any player who violates his contract or reservation, or who participates in a game with or against a club containing or controlled by ineligible players or a player under indictment for conduct detrimental to the good repute of professional baseball, shall be considered an ineligible player and placed on the ineligible list.

"9. That an ineligible player must be reinstated before he may be released from his contract.

"10. That clubs shall not tender contracts to ineligible players until they are reinstated.

"11. That no club may release unconditionally an ineligible player unless such player is first reinstated from the ineligible list to the active list.

"XIII.

"That by reason of Plaintiff being placed and held on said ineligible list as hereinabove set out and the making of the aforementioned contract by the Defendants, the Defendant[s], and each of them, have

plaintiffs allege that because of illegal and inequitable agreements of interstate scope between organized baseball and the Mexican League binding each to respect the other's "reserve clauses" they have lost the services of and contract rights to certain baseball players. The plaintiffs also allege that the defendants have entered into a combination, conspiracy and monopoly or an attempt to monopolize professional baseball in the United States to the substantial damage of the plaintiffs.

Conceding the major asset which baseball is to our Nation, the high place it enjoys in the hearts of our people and the possible justification of special treatment for organized sports which are engaged in interstate trade or commerce, the authorization of such treatment is a matter within the discretion of Congress.[11] Congress, however, has enacted no express exemption of organized baseball from the Sherman Act, and no court has demonstrated the existence of an implied exemption from that Act of any sport that is so highly organized as to amount to an interstate monopoly or which restrains interstate trade or commerce. In the absence of such an exemption, the present

refused since the 25th day of May, 1950, and still do refuse to allow Plaintiff to play professional baseball, and that Plaintiff has thereby been deprived of his means of livelihood, all to the Plaintiff's damages in the sum of $125,000.00."

The complaint also contains a separate cause of action alleging that the defendants, by virtue of their agreements, have entered into a combination and conspiracy in the restraint of trade or commerce among the several states, and another cause of action alleging that the defendants have, by their agreements, combined to monopolize professional baseball in the United States.

[11] *E. g.*, Congress has expressly exempted certain specific activities from the Sherman Act, as in § 6 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 17 (labor organizations), in the Capper-Volstead Act, 42 Stat. 388–389, 7 U. S. C. §§ 291, 292 (farm cooperatives), and in the McCarran-Ferguson Act, 59 Stat. 34, 61 Stat. 448, 15 U. S. C. (Supp. V) § 1013 (insurance). And see *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 501, 512.

popularity of organized baseball increases, rather than diminishes, the importance of its compliance with standards of reasonableness comparable with those now required by law of interstate trade or commerce. It is interstate trade or commerce and, as such, it is subject to the Sherman Act until exempted. Accordingly, I would reverse the judgments in the instant cases and remand the causes to the respective District Courts for a consideration of the merits of the alleged violations of the Sherman Act.