Curtis C. FLOOD, Plaintiff-Appellant,

v.

Bowie K. KUHN et al., Defendants-Appellees.

No. 608, Docket 35424.

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1971.

Decided April 7, 1971.

Arthur J. Goldberg, Jay H. Topkis, Max Gitter, William D. Iverson, Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City, for plaintiff-appellant.

Paul A. Porter, Victor H. Kramer, Douglas G. Robinson, Arnold & Porter, Washington, D. C., George S. Leisure, Jr., John E. Tobin, Donovan, Leisure, Newton & Irvine, New York City, for defendant-appellee Kuhn.

Louis L. Hoynes, Jr., Louis F. Carroll, Mark F. Hughes, Barry Rona, Robert J. Kheel, Willkie, Farr & Gallagher, New York City, Alexander H. Hadden, James P. Garner, G. Warren Daane, Sargent Karch, Baker, Hostetler & Patterson, Cleveland, Ohio, for all defendants-appellees except Kuhn.

Before WATERMAN, MOORE and FEINBERG, Circuit Judges.

WATERMAN, Circuit Judge:

Plaintiff and his able counsel have undertaken a comprehensive attack on professional baseball's "reserve system," which, pursuant to nationwide agreements among clubs, effectively restricts a baseball player, if he desires to play professional baseball at all, to contract negotiations with that club in organized baseball which first employs or "reserves" him or with that club's assignee club, and any subsequent assignee clubs, to which in the parlance of the baseball business he has been "sold" or "traded." After an extensive trial below the complaint was dismissed and, with the benefit of an all-inclusive record, this appeal followed. Four counts of plaintiff's complaint are here involved:[1] the first alleges that the reserve system and its boycott sanctions violate the Sherman Act, the second alleges violations of the antitrust laws of the states and the foreign country, Canada, where defendants conduct their business, the third alleges violations of the common law, and the fourth challenges the reserve system under the Thirteenth Amendment. Federal jurisdiction on the second and third counts is premised on diversity of citizenship. For the reasons stated below, we are compelled to affirm the district court's decision.

### I.

In Federal Baseball Club v. National League, 259 U.S. 200, 42 S.Ct. 465, 66 L. Ed. 898 (1922), a unanimous Supreme Court speaking through Mr. Justice Holmes held that the business of organized baseball was not subject to the Sherman Act because it did not constitute interstate commerce, although it was explicitly pointed out in the opinion that the clubs composing the Leagues are in different cities and, for the most part, in different states, and that when the clubs meet to play against one another

1. In his complaint plaintiff named as defendants each of the twelve clubs in each of the two major leagues, and, also, in the antitrust cause of action, the presidents of each league, Charles S. Feeney and Joseph E. Cronin, and the Commissioner of Baseball, Bowie K. Kuhn, individually and in their respective official capacities.

in public exhibitions for money the clubs cross state lines in order to make the meetings possible. In 1953 the Court, with two Justices dissenting, declined, without any reexamination of the underlying issues, to review its 1922 approach despite the considerable change the Court itself had fostered during the intervening thirty years in the definition of "interstate commerce." The Court indicated that, inasmuch as those interested in the business of organized baseball had relied for 30 years upon the ruling in *Federal Baseball,* remedial action was better left to Congress. Toolson v. New York Yankees, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953). In 1957, in contrast, the Court held that the Sherman Act was applicable to professional football. Radovich v. National Football League, 352 U. S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957).

Although faced with the seemingly inconsistent decisions in *Toolson* and *Radovich,* our court only last summer refused, in Salerno v. Amercan League, 429 F.2d 1003 (2 Cir. 1970), cert. denied, Salerno v. Kuhn, 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452, 1971,[2] to depart from the Supreme Court's holding in *Toolson.* As we stated in *Salerno*:

> We freely acknowledge our belief that *Federal Baseball* was not one of Mr.

Justice Holmes' happiest days, that the rationale of *Toolson* is extremely dubious and that, to use the Supreme Court's own adjectives, the distinction between baseball and other professional sports is "unrealistic," "inconsistent" and "illogical." Radovich v. National Football League, 352 U.S. 445, 452, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957). * * * However, * * * we continue to believe that the Supreme Court should retain the exclusive privilege of overruling its own decisions, save perhaps when opinions already delivered have created a near certainty that only the occasion is needed for pronouncement of the doom. While we should not fall out of our chairs with surprise at the news that *Federal Baseball* and *Toolson* had been overruled, we are not at all certain the Court is ready to give them a happy despatch. 429 F.2d at 1005.

We adhere to the sentiments we expressed in *Salerno* and are compelled to affirm the dismissal of plaintiff's first count.[3]

## II.

We treat together plaintiff's second and third counts, alleging violations of state antitrust laws and violations of the common law.[4] At the threshold we find

---

2. It is well settled that denial of certiorari by the Supreme Court does not indicate any decision with reference to the merits of a case. United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955); Agoston v. Commonwealth of Pennsylvania, 340 U.S. 844, 71 S.Ct. 9, 95 L.Ed. 619 (1950). This would seem to be particularly true in *Salerno* where the plaintiffs, being umpires, were not subject to the provisions of a player's reserve clause and had "exceedingly difficult obstacles" to overcome in addition to *Federal Baseball* and *Toolson.* 429 F.2d at 1005.

3. It should be noted that in 1949 two distinguished members of this court, Judge Learned Hand and Judge Jerome Frank, confidently predicted the overruling of *Federal Baseball* insofar as that holding dealt with the reserve system. Gardella v. Chandler, 172 F.2d 402 (2 Cir. 1949). In particular, Judge Frank stated:

> "This court cannot, of course, tell the Supreme Court that it was once wrong. But 'one should not wait for formal retraction in the face of changes plainly foreshadowed;' this court's duty is 'to divine, as best it can, what would be the event of the appeal in the case before it.' L. Hand, C. J., dissenting in Spector Motor Service Co. v. Walsh, 2 Cir., 139 F.2d 809, 823." 172 F.2d at 409 n. 1.

Inasmuch as shortly thereafter, in 1953, *Toolson* proved these distinguished jurists' prediction to be premature, we do not venture to prophesy the Supreme Court's decision in the present case.

4. Plaintiff acknowledges that, since Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), the common law to be applied in federal court

nothing in *Federal Baseball* or in *Toolson* which would indicate, as defendants urge, that the Supreme Court exempted baseball. from all antitrust regulation. Nor, on the other hand, do these cases hold, as plaintiff urges, that state antitrust laws apply to baseball. These cases speak only to the applicability of federal antitrust policies: whether state antitrust laws might apply was not directly decided. Thus, we are faced with a question of first impression, and we must consider whether application of state antitrust law to professional baseball is barred by a federal pre-emption of the field under the Commerce Clause.

■ It appears to be without question that, today, professional baseball, with its complex web of franchises, farm teams and recruiters, and its multi-million dollar contracts with television and radio networks, is interstate commerce. Our difficulty lies in determining to what extent, if at all, the states are precluded from antitrust regulation of interstate commerce. *See* Note, The Commerce Clause and State Antitrust Regulation, 61 Colum.L.Rev. 1469 (1961). The Supreme Court has not, to our knowledge, expressed any opinion as, to the outer limits of state antitrust policy, although it has clearly held that state antitrust policy is not ousted from the regulation of local matters which may also be affected by federal laws. See Watson v. Buck, 313 U.S. 387, 403–404, 61 S.Ct. 962, 85 L.Ed. 1416 (1941); Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 495, 69 S.Ct. 684, 93 L.Ed. 834 (1949). Therefore, we turn for guidance to cases involving other areas of state regulation.

■ Plaintiff argues that recent Supreme Court decisions have evidenced a trend toward the requiring of an actual conflict, as opposed to a potential conflict, resulting from differing state regulation if state action is to be precluded under the Commerce Clause.[5] He asserts that, with reference to control over baseball's reserve system, there is no actual conflict among the requirements of state antitrust laws. While we recognize this trend, we do not consider this distinction between actual and potential conflicts to be the sole criterion for finding an impermissible burden on interstate commerce. For example, in taxation cases, there is no conflict between two states taxing the same property, but there may well be a burden on interstate commerce. Norfolk & W. R. Co. v. Missouri State Tax Comm., 390 U.S. 317, 323–325, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968). Also, where the nature of an enterprise is such that differing state regulation, although not conflicting, requires the enterprise to comply with the strictest standard of several states in order to continue an interstate business extending over many states, the extra-territorial effect which the application of a particular state law would exact constitutes, absent a strong state interest, an impermissible burden on interstate commerce. Southern Pacific Co. v. Arizona, 325 U.S. 761, 774–775, 65 S.Ct. 1515, 89 L.Ed. 1915 (1945).

■ Professional baseball clubs, although existing as separate legal entities, are organized into so-called leagues for competitive play and are dependent on the league playing schedule to further the ends of their sports competition. There-

---

is the common law of the individual states. However, he urges that a federal common antitrust law may be appropriate where uniformity among the states is needed. Inasmuch as federal antitrust policy is embodied in Acts of Congress, this approach would seem to be merely an attempt to avoid *Toolson* by entering through the back door.

With reference to applying state common law to the problem here, it is obvious

that the arguments based upon varying state statutory antitrust standards are equally applicable to the common law of the several states.

5. Compare Bibb v. Navajo Freight Lines, 359 U.S. 520, 527, 79 S.Ct. 962, 3 L.Ed. 2d 1003 (1959), with Huron Portland Cement Co. v. City of Detroit, 362 U.S. 440, 448, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960).

fore, it is the league structure at which any state antitrust regulation must be aimed if organized professional baseball is not to be severely fragmented. On the one hand, it is apparent that each league extends over many states, and that, if state regulation were permissible, the internal structure of the leagues would require compliance with the strictest state antitrust standard. The consequent extra-territorial effect of necessary compliance would be considerably more far-reaching than that in Southern Pacific Co. v. Arizona, *supra*. On the other hand, we do not find that a state's interest in antitrust regulation,[6] when compared with its interest in health and safety regulation, is of particular urgency. Hence, as the burden on interstate commerce outweighs the states' interests in regulating baseball's reserve system, the Commerce Clause precludes the application here of state antitrust law.

We readily acknowledge that plaintiff is caught in a most frustrating predicament, a predicament which defendants have zealously seized upon with great perspicacity. On the one hand, the doctrine of stare decisis [7] binds the plaintiff because of an initial holding that baseball is not "interstate commerce" within the Sherman Act, and, on the other hand, after there have been significant changes in the definition of "interstate commerce," he is now told that baseball is so uniquely interstate commerce that state regulation cannot apply.[8] However, in our own defense, we do not consider our decision to be internally inconsistent. In

disposing of the Sherman Act count in plaintiff's complaint, we are bound by Supreme Court decision, while in our disposition of the state and common law counts, we must of necessity decide this question of first impression by present Commerce Clause standards and not the standards applicable in 1922. Any apparent inconsistency results not from faulty logic, but from the vagaries of fate and this court's subordinate role to the Supreme Court.

The defendants also claim that under federal labor law the reserve clause is a subject of mandatory bargaining between the ballplayers and the club owners and, therefore, that federal labor policy exempts the reserve system from state regulation. Because of our disposition of plaintiff's second and third counts on Commerce Clause grounds, we find it unnecessary to reach this additional contention.

### III.

■ Inasmuch as plaintiff retains the option not to play baseball at all, his Thirteenth Amendment argument is foreclosed by this court's decision in United States v. Shackney, 333 F.2d 475 (2 Cir. 1964), a decision which we adhere to as sound.

The judgment of dismissal is affirmed.

MOORE, Circuit Judge (concurring):

Baseball for almost a century has been our country's "national" sport. Every decade since the days of Abner Doubleday and A. G. Spalding has developed

---

6. See Note, *supra*, 61 Colum.L.Rev. 1469, 1471–1473 (1961).

7. We leave to the commentators the relevance of Mr. Justice Holmes' much-quoted comment on precedent to his opinion in *Federal Baseball* and the decision in *Toolson:*

> It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past.

Oliver Wendell Holmes, Path of the Law, 10 Harv.L.Rev. 457, 469 (1897).

8. Unlike the ballplayers, baseball management has been quite adept at forecasting legal decisions. In *Federal Baseball* counsel for the defendants opened his argument: "Organized Baseball is not interstate commerce * *. *." 259 U.S. 200, 206, 42 S.Ct. 465 (1922). Having obtained an exemption from the Sherman Act under the legal standards of 1922, professional baseball can now properly urge that baseball in 1971 is indeed both interstate and international commerce.

outstanding players, heroes in the hearts and minds of millions of Americans—heroes whose names are enshrined in a baseball "Hall of Fame." In this century alone the names of such players (to select a few) as Christy Mathewson, Walter Johnson, the remarkable Ty Cobb, Babe Ruth of home-run fame, Lou Gehrig and more recently Ted Williams and Willie Mays were probably better known to a greater number of our populace than many of our statesmen; and their exploits better remembered than the activities of our outstanding public figures. Such slogans as "Tinker-to-Evers-to-Chance" became by-words. Even big businesses—at least their employees—were apt to subordinate their important affairs to baseball at the time of the October World Series. And such names as the Dodgers, the Yankees, Cubs, Giants and Braves were household words. In short, organized baseball existed almost as an enclave or feudal barony throughout the years, managing its own affairs as best calculated to preserve the sport and maintaining its own officialdom for self-regulation purposes—and, except for the brief scandal of the so-called Chicago Black Sox of 1919, apparently has handled its little kingdom and its subjects very well.[1]

Until 1913 there were two leagues, the National and the American, which were known as the major leagues, each league consisting of eight teams in major cities of the country. In that year a new league came into being, the "Federal League of Professional Baseball Clubs." This league issued franchises to clubs also in various cities, some of which had teams in the National and American Leagues. The "Federal League" continued in existence until December 1915 when by agreement with the National and American Leagues it and its constituent clubs dissolved except for the "Federal Baseball Club of Baltimore, Inc." (Baltimore). Asserting that the dissolution was caused by acts in violation of the federal antitrust laws, Baltimore brought suit for treble damages against the major leagues and certain of their officers. A judgment of $240,000 was obtained by Baltimore. Upon appeal to the Court of Appeals, the judgment was reversed with instructions to enter judgment for the defendants in the suit.

Since the suit was based on the antitrust laws which in turn involved interstate commerce, the Court of Appeals after reviewing the *modus operandi* of the two major leagues and their regulatory body, the National Commission, discussed the case in relation to these laws and directed itself to answering the question whether baseball exhibitions constituted "trade or commerce within the meaning of the Sherman Act?" and involved interstate commerce.

The court concluded that a "game of baseball" was purely "local in its beginning and in its end" and that although the players traveled from place to place in interstate commerce, "they are not the game." The Court said, "Not until they [the players] come into contact with their opponents on the baseball field and the contest opens does the game come into existence."—hence—"the game effects no exchange of things according to the meaning of 'trade or commerce.' " National League of Prof. Baseball Clubs v. Federal Baseball Club of Baltimore, Inc., 50 App.D.C. 165, 269 F. 681, 684–685 (1920).

The court also considered the restrictive clauses (as here) in the players' contracts as allegedly violative of the antitrust laws and commented that "If the reserve did not exist, the highly skillful players would be absorbed by the more wealthy clubs, and thus some clubs in the league would so far outstrip others in playing ability that the contests between the superior and inferior clubs would be uninteresting, and the public would refuse to patronize them." Moreover, the reserve clause had the effect "of preventing players from disregarding their obligations." 269 F. at

---

[1]. For a detailed description of modern baseball organization, see the findings of fact

in State v. Milwaukee Braves, Inc., 31 Wis.2d 699, 144 N.W.2d 1, 3–5 (1966).

687. The case was then argued before the Supreme Court.

This somewhat lengthy preamble is deemed necessary both to understand and put in proper perspective the Supreme Court decision,[2] featured in appellant's and appellees' arguments. The syllabus of the arguments reveals that the points urged in 1971 were not dissimilar to those urged in 1922. In a brief opinion, Mr. Justice Holmes wrote for the court (there being no dissent) : "The decision of the Court of Appeals went to the root of the case and if correct makes it unnecessary to consider other serious difficulties in the way of the plaintiff's recovery." 259 U.S. at 208, 42 S.Ct. at 465. The Court adopted the lower court's concept of baseball exhibitions as "purely state affairs" and that interstate transportation of players and equipment was only incidental thereto. 259 U.S. at 208, 209, 42 S.Ct. 465. In short, the Court held that the personal efforts of the players was "not a subject of commerce," and that "restrictions by contract that prevented the plaintiff from getting players to break their bargains * * * were not an interference with commerce among the States." 259 U.S. at 209, 42 S.Ct. at 466.

After this decision some 31 years elapsed during which the New York Yankees and Giants vied for supremacy in many of these years in Worlds Series before huge crowds concentrating in New York from the then 48 States. Other clubs broke the Yankee-Giant monopoly without the aid of antitrust laws and achieved championship rank, including the Senators, the Reds, the Tigers, the Athletics and the Cards (the cities can be identified without footnotes).

In the interval between 1922 and 1953, this court considered a suit based upon the alleged illegality of the reserve clause in Gardella v. Chandler, 172 F.2d 402 (1949). Although by a two-to-one

decision the court remanded the case for trial, Judge Frank's prediction that the Supreme Court had "completely destroyed the vitality of *Federal Baseball*" and had "left that case but an impotent zombie." 172 F.2d at 408, 409, turned out to be highly inaccurate in the light of the Supreme Court's subsequent 1953 and 1957 decisions.

In 1953, on facts not dissimilar from those of this case, the Supreme Court again had an opportunity to examine (or better to re-examine) organized baseball through antitrust glasses. Toolson v. New York Yankees, Inc., 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953) had originated in a suit by Toolson, a professional baseball player who claimed that while under contract with Newark his contract was assigned to Binghamton. He refused to report to Binghamton and was placed on an ineligible list, thus preventing him from playing. On motion the action was dismissed "for want of jurisdiction." The district court relied on the Supreme Court's decision in *Federal Baseball* and referred to the many cases in which that decision had been cited with approval.[3] The Ninth Circuit Court of Appeals affirmed on the lower court's opinion. 200 F.2d 198 (1952).

The Supreme Court in its decision left no doubt "that the business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws," and that "Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." 346 U.S. at 357, 74 S.Ct. at 79. The majority commented that for thirty years Congress had allowed baseball "to develop, on the understanding that it was not subject to existing antitrust legislation" and that any change should be made by congressional action. *Id.* The Court did not restrict itself to

---

2. Federal Baseball Club of Baltimore, Inc. v. National League of Prof. Baseball Clubs, 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922).

3. Toolson v. New York Yankees, 101 F. Supp. 93, 94 (S.D.Cal.1951).

federal or state laws but said "existing antitrust legislation." *Id.*

During the intervening years from 1922 to date, other sports developed their professional intercity teams, formed leagues and achieved a public popularity scarcely envisioned in the earlier days. As communications facilities and techniques developed that which was clicked out by telegraph key or transmitted by telephone was superseded by radio and television. However, the interstate transmission of news was not changed; only the methods. Although arguments are made by court and counsel based upon alleged factual changes with respect to interstate communications, the business of baseball has not changed its interstate character over the years. Of necessity it has always been interstate. Now there are more viewers across the nation but this fact is not relevant to the interstate nature of the sport except to make it more so.

In 1954 two types of entertainment by means of public exhibition sought to take advantage of *Federal Baseball* and *Toolson, i.e.,* theatrical performances and boxing. Interstate commerce was definitely involved in both cases and in each case the government's antitrust complaint had been dismissed on motion in reliance by the district court on *Federal Baseball* and *Toolson.* United States v. Shubert, 348 U.S. 222, 75 S.Ct. 277, 99 L.Ed. 279 (1955) and United States v. International Boxing Club of New York, Inc., 348 U.S. 236, 75 S.Ct. 259, 99 L. Ed. 290 (1955), decided the same day. In *Shubert* the Supreme Court interpreted *Federal Baseball* as "dealing with the business of baseball and nothing else," and that *Federal Baseball* "did not automatically immunize the theatrical business from the antitrust laws." 348 U.S. at 228, 229, 75 S.Ct. at 282. As to *Toolson* the Court said, "For over 30 years there had stood a decision of this Court specifically fixing the status of the baseball business under the antitrust laws and more particularly the validity of the so-called 'reserve clause,' " a ruling which Congress had actively considered but

which it had "not seen fit to reject [it] by amendatory legislation." 348 U.S. at 229, 75 S.Ct. at 282. In *International Boxing Club* the Court refused to extend the baseball exemption to boxing but continued to recognize the unique position of organized baseball as buttressed by *Federal Baseball* and *Toolson.* See 348 U.S. at 242, 75 S.Ct. 259.

Two years later the Supreme Court had to face the claim of a professional football player that the National Football League, its member clubs and the commissioners of two leagues had conspired to violate the antitrust laws because of a restrictive player contract. Radovich v. National Football League, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957). Again the Supreme Court clearly indicated that organized baseball still occupied its exempt status, saying, "[W]e now specifically limit the rule there established to the facts there involved, *i.e.,* the business of organized professional baseball." 352 U.S. at 451, 77 S.Ct. at 394. The Court stated its reasons for its limitation:

> "The Court did this because it was concluded that more harm would be done in overruling *Federal Baseball* than in upholding a ruling which at best was of dubious validity. Vast efforts had gone into the development and organization of baseball since that decision and enormous capital had been invested in reliance on its permanence. Congress had chosen to make no change. All this, combined with the flood of litigation that would follow its repudiation, the harassment that would ensue, and the retroactive effect of such a decision, led the Court to the practical result that it should sustain the unequivocal line of authority reaching over many years."

352 U.S. at 450, 77 S.Ct. at 393.

The Court's own policy for the future was set forth: "As long as the Congress continues to acquiesce we should adhere to—but not extend—the interpretation of the Act made in those [*Federal Baseball* and *Toolson*] cases." 352 U.S. at 451, 77 S.Ct. at 394. That interpreta-

tion was: "But *Federal Baseball* held the business of baseball outside the scope of the Act." 352 U.S. at 452, 77 S.Ct. at 394. The Court recognized that "the doctrine of *Toolson* and *Federal Baseball* must yield to any congressional action and continues only at its sufferance." but concluded that "[t]his is not a new approach. See Davis v. Department of Labor, 317 U.S. 249, 255, 63 S. Ct. 225, 87 L.Ed. 246 (1942); compare Rutkin v. United States, 343 U.S. 130 [72 S.Ct. 571, 96 L.Ed. 833] (1952)." *Id.*

The last word from this court is to be found in Salerno v. American League of Prof. Baseball Clubs, 429 F.2d 1003 (1970), cert. denied, sub nom. Salerno v. Kuhn, 400 U.S. 1001, 91 S.Ct. 462, 27 L. Ed.2d 452 (January 12, 1971). The suit was brought in the district court by two discharged umpires who claimed that their discharge was caused by their endeavor to organize American League umpires for collective bargaining. Charges of unfair labor practices were also filed with the National Labor Relations Board. The motion to dismiss the cause of action based on the antitrust laws was granted. On appeal this court said that there was "serious doubt whether the complaint here stated a claim under them [antitrust laws]," but then went on to discuss the likely overruling of *Federal Baseball* and *Toolson*. The court recognized that *Toolson* was based upon the ground that "Congress had no intention to bring baseball within the antitrust laws, not that baseball's activities did not sufficiently affect interstate commerce." The dismissal was affirmed, the court reserving for the Supreme Court "the exclusive privilege of overruling its own decisions." 429 F.2d at 1005.

In my opinion there is no likelihood that such an event will occur. As I analyze the history of organized professional baseball over the last 50 years, it has shown without Court interference remarkable stability under self-discipline. The Supreme Court in 1922 undoubtedly felt that it should adopt a "hands off" policy as to this one particular sport which had attained by then such a national standing that only Congress should have the power to tamper with it. And properly so. Baseball's welfare and future should not be for politically insulated interpreters of technical antitrust statutes but rather should be for the voters through their elected representatives. If baseball is to be damaged by statutory regulation, let the congressman face his constituents the next November and also face the consequences of his baseball voting record.

Just as the Supreme Court in 1955 recognized that baseball "had grown and developed" and "in reliance on the *Federal Baseball* precedent," United States v. Shubert, *supra*, 348 U.S. at 229, 75 S.Ct. at 282, so much the more has it grown between 1955 and 1971. The eight teams in each league have been expanded to twelve. Thus twenty-four teams are playing intersectional games in many cities which did not have major league exhibitions available in former years. The reasons for adopting a "hands off" policy by the courts of this particular sport have multiplied. Congressional and Labor Board attention is being given in such areas of baseball as may be appropriate for regulation.

Appellant argues that even if this court follows *Federal Baseball* and *Toolson*, "THEN IT MUST SUBJECT BASEBALL TO STATE LAWS." True, in *Federal Baseball* the distinguished justice did refer to baseball exhibitions as "purely state affairs." But from this reference does not follow the conclusion that, therefore, state antitrust laws apply. To the contrary, the decision was based upon the assumption that baseball is "not a subject of commerce." 259 U.S. at 209, 42 S.Ct. at 466. However, if there were to be any doubt, the Supreme Court itself resolved those doubts in *Toolson*.

The organization of professional baseball as it now exists cannot be better stated than in the findings of fact of the trial court and in the opinion of Mr. Justice Fairchild in State v. Milwaukee Braves, Inc., 31 Wis.2d 699, 144 N.W.2d

1 (1966). Equally well set forth are the reasons why organized professional baseball could not possibly be subjected to the antitrust laws of the several States in which the games are played.

Therefore, without any reservations or doubts as to the soundness of *Federal Baseball* and *Toolson*, I would affirm the decision below on all four counts and would limit the participation of the courts in the conduct of baseball's affairs to the throwing out by the Chief Justice (in the absence of the President) of the first ball of the baseball season.