Pamela A. POSTEMA, Plaintiff,

v.

NATIONAL LEAGUE OF PROFESSIONAL BASEBALL CLUBS, American League of Professional Baseball Clubs, Triple–A Alliance of Professional Baseball Clubs, and Baseball Office of Umpire Development, Defendants.

No. 91 Civ. 8507 (RPP).

United States District Court,
S.D. New York.

July 17, 1992.

**1477**

Gray, Plant, Mooty, Mooty & Bennett, P.A. by Daniel R. Shulman, Minneapolis, Minn., for plaintiff.

Willkie, Farr & Gallagher by Robert J. Kheel, New York City, for defendant National League of Professional Baseball Clubs.

Baker & Hostetler by Lee T. Ellis, Jr., Brian S. Harvey, Washington, D.C., for defendant American League of Professional Baseball Clubs.

Raymond L. Vandenburg, New York City, for defendant Triple–A Alliance of Professional Baseball Clubs.

Paul, Hastings, Janofsky & Walker by Cheryl Saban, New York, for Baseball Office of Umpire Development.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is an action for damages and injunctive relief alleging employment discrimination in violation of: (1) Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e–2(a)(1); (2) New York's Human Rights Law, N.Y.Exec.L. § 296; and (3) the common law of restraint of trade.

Defendant American League of Professional Baseball Clubs ("American League") moves: (a) pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on Plaintiff's Title VII claim, or in the alternative, pursuant to Rule 12(b)(6) for dismissal of Plaintiff's request for a jury trial and prayer for compensatory and punitive damages; (b) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of Plaintiff's Human Rights Law claim, or in the alternative, dismissal of Plaintiff's request for a jury trial and prayer for punitive damages; and (c) pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure for dismissal of Plaintiff's common law restraint of trade claim.

Defendants National League of Professional Baseball Clubs ("National League"), Triple–A Alliance of Professional Baseball Clubs ("Triple–A"), and the Baseball Office for Umpire Development ("BOUD") join in parts (b) and (c) of the American League's motion.

For the reasons set forth below, the motions are granted in part and denied in part.

## BACKGROUND

For her complaint, Plaintiff alleges the following.

### I. THE PARTIES

Plaintiff Pamela Postema, a California resident, is a former professional baseball umpire.

Defendant National League is an unincorporated association of professional baseball clubs that constitute the National League, one of the two major leagues of professional baseball. The National League has its principal place of business and headquarters in New York City.

Defendant American League is an unincorporated association of professional baseball clubs that constitute the American League, the other major league of professional baseball. The American League also has its principal place of business and headquarters in New York City.

Defendant Triple–A is an unincorporated association of minor league professional baseball clubs that constitute and operate the Triple–A Alliance minor league. Triple–A consists of AAA-rated[1] baseball clubs that were formerly members of two separate AAA minor leagues, the American Association and the International League. Triple–A has its principal place of business and headquarters in Grove City, Ohio.

Triple–A and the other minor leagues of professional baseball are members of the National Association of Professional Baseball Leagues (the "National Association"), an unincorporated association of minor

---

**1.** Minor leagues of professional baseball are classified according to their level of ability and competition. The highest rating is AAA, that of the Triple–A Alliance. The lower ratings, in order of descending ability and competition, are AA, A, and rookie or instructional league.

leagues in the United States. The National Association, which is not a party to this action, has its principal place of business in New York City. The National League, American League, and the National Association are all subject to the common oversight and direction of the Commissioner of Baseball.

Defendant BOUD is an unincorporated affiliate of the other Defendants and of the National Association. Its principal place of business and headquarters is in St. Petersburg, Florida. BOUD is vested with responsibility for finding, evaluating, overseeing, training, developing, and supervising umpires for professional baseball games played by members of the National Association.

## II. EVENTS UNDERLYING THIS LAWSUIT

After graduating from umpiring school with the rank of 17th in a class of 130 students, Plaintiff began work in 1977 as a professional baseball umpire in the Gulf Coast League, a rookie league. At that time, she was the fourth woman ever to umpire a professional baseball game. Plaintiff worked in the Gulf Coast League during 1977 and 1978. In 1979, she was promoted to the Class A Florida State League, where she umpired during the 1979 and 1980 seasons. In 1981, Plaintiff was promoted to the AA Texas League, and she umpired there in 1981 and 1982. She was the first woman to ever umpire a professional baseball game above the Class A level.

In 1983, Plaintiff was promoted to the AAA Pacific Coast League, where she umpired from 1983 to 1986. In 1987, her contract was acquired by Triple–A, and she umpired in that league from 1987 until her discharge in 1989.

Plaintiff alleges that during her employment as a Triple–A umpire, Defendants conferred on her significant duties and responsibilities, including the following:

* In 1987, Plaintiff was the home plate umpire for the Hall of Fame exhibition game between the New York Yankees and the Atlanta Braves.

* In 1988, Plaintiff was selected to umpire the Venezuela All Star game.

* In 1988 and 1989, Plaintiff was the chief of her umpiring crew, with ultimate responsibility for its umpiring calls and performance.

* In 1988 and 1989, Plaintiff was appointed to umpire major league spring training games.

* In 1989, Plaintiff was the home plate umpire for the first Triple–A Minor League All Star Game.

* In 1989, Plaintiff was asked by Triple–A to become a supervisor for umpires in the minor league system.

* From 1987 to 1989, Plaintiff received high praise from qualified and experienced baseball people, including Chuck Tanner, Tom Trebelhorn, Hal Lanier, and Roger Craig, all current or former managers of major league teams.

Notwithstanding these responsibilities and honors, Plaintiff alleges that throughout her career as a minor league umpire she was subjected to continual, repeated, and offensive acts of sexual harassment and gender discrimination. Such acts included the following:

* On numerous occasions, players and managers addressed her with a four-letter word beginning with the letter "c" that refers to female genitalia.

* Players and managers repeatedly told Plaintiff that her proper role was cooking, cleaning, keeping house, or some other form of "women's work," rather than umpiring.

* Bob Knepper, a pitcher with the Houston Astros, told the press that although Plaintiff was a good umpire, to have her as a major league umpire would be an affront to God and contrary to the teachings of the Bible.

* During arguments with players and managers, Plaintiff was spat upon and was subjected to verbal and physical abuse to a greater degree than male umpires.

* In 1987, the manager of the Nashville Hounds kissed Plaintiff on the lips when he handed her his lineup card.

\* At a major league spring training game in 1988, Chuck Tanner, then the manager of the Pittsburgh Pirates, asked Plaintiff if she would like a kiss when he gave her his lineup card.

\* Although Plaintiff was well known throughout baseball as an excellent ball and strike umpire, she was directed and required by Ed Vargo, the Supervisor of Umpiring for the National League, to change her stance and technique to resemble those used by him during his career. No such requirement was placed on male umpires.

Plaintiff continually took action against such conduct through warnings, ejections, and reports. Although the existence of such conduct was well known throughout baseball, no one in a position of authority, including Defendants, took action to correct, stop, or prevent such conduct.

Plaintiff alleges that at the time she began her service with Triple–A, she was fully qualified to be a major league umpire, and she had repeatedly made known to Defendants her desire for employment in the major leagues. While she was not promoted to or hired by the National League or American League, male umpires having inferior experience, qualifications, and abilities were repeatedly and frequently promoted and hired by the National and American Leagues.

Plaintiff alleges that in 1988 and 1989, "events came to a head" in her effort to become a major league umpire. Specifically, in July 1987, Dick Butler, then Special Assistant to the President of the American League and the former supervisor of umpires for the American League, told *Newsday* that for Plaintiff to become a major league umpire:

> She realizes that she has to be better than the fellow next to her. She's got to be better because of the fact that she's a girl. I'm not saying it's fair, but it exists and she's not going to change it.

These comments were widely reported in the media, including in the *Los Angeles Times*. Defendants neither issued any statements contradicting, retracting, or correcting Butler's statements, took any remedial or disciplinary action with respect to Butler, nor otherwise said or did anything to communicate that Butler had not stated the true position of professional baseball, including Defendants.

In 1988, Bob Knepper made the above referenced remarks which resulted in national press coverage and widespread public controversy.

On May 14, 1989, Larry Napp, Assistant Supervisor of Umpires for the American League, told the *Richmond Times–Dispatch* that Plaintiff would never become a major league umpire. He stated:

> She's a nice person, and she knows the rules. But the thing is, she's got to do the job twice as good as the guy, if he's a good one to get the job.

Defendants neither issued any statements contradicting, retracting, or correcting Napp's statements, took any remedial or disciplinary action with respect to Napp, nor otherwise said or did anything to communicate that Napp had not stated the true position of professional baseball, including Defendants.

During the 1989 season, Ed Vargo required Plaintiff to adopt the above mentioned changes in her umpiring technique.

Plaintiff alleges that during the 1989 season, Defendants either ignored or criticized her. She and her partner were the only two of the nine minor league umpires invited to 1989 spring training who were not given the opportunity to fill in for ill or vacationing major league umpires, an opportunity which was given to male umpires with inferior abilities, experience, and qualifications. At the end of the 1989 season, Plaintiff received an unfairly negative written performance evaluation which alleged that she had a "bad attitude." Prior to 1989, Plaintiff had never received a written performance evaluation.

On November 6, 1989, Triple–A discharged and unconditionally released Plaintiff from her employment as an umpire. The reason for Plaintiff's discharge was that the National League and American League were not interested in considering her for employment as a major league um-

**1480**

pire. Plaintiff alleges that the sole reason for her discharge, for her inability to obtain a job in the major leagues, and for the Defendants' other discriminatory conduct was Defendants' malicious, wanton, willful, knowing, and intentional discrimination on the basis of gender.

Plaintiff requests the following relief: actual damages, punitive or exemplary damages, interest on all damages, an award of costs and attorney's fees, an order requiring Defendants to employ Plaintiff as an umpire in the major league, and an injunction preventing Defendants from engaging in the unlawful conduct complained of herein.

## DISCUSSION

### I. TITLE VII CLAIMS

#### A. *The American League's Motion for Summary Judgment*[2]

Summary judgment is appropriate if the evidence offered demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden rests on the moving party to demonstrate the absence of a genuine issue of material fact, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and the Court must view the facts in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

Plaintiff asserts essentially two separate Title VII claims against the American League: a claim for failure to hire or promote, and a claim for wrongful termination.

##### 1. Hiring or Promotion Claim

The American League maintains that it is entitled to summary judgment with respect to Plaintiff's claim for failure to hire or promote because: (1) any claim Plaintiff has arising from the American League's most recent umpire hiring is time-barred, and (2) Plaintiff cannot establish a prima facie case of discrimination in promotion or hiring where no one, either male or female, was hired for or promoted to the position sought.

###### a. *The American League's most recent umpire hiring*

"A Title VII plaintiff must file a charge with the EEOC [Equal Employment Opportunity Commission] within 180 days of the violation or, where the plaintiff first files with a state or local equal employment agency, within 300 days of the violation. 42 U.S.C. § 2000e–5(e)." *Gomes v. Avco Corp.*, 964 F.2d 1330 (2d Cir.1992). Timely filing with the EEOC is a mandatory prerequisite to the subsequent maintenance of a Title VII claim. *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 555, 97 S.Ct. 1885, 1887, 52 L.Ed.2d 571 (1977).

Plaintiff admits that since 1988, the American League has had only one opening for and has hired only one umpire; former minor league umpire Jim Joyce was hired in April 1989. American League 3(g) Stmt. ¶¶ 3–4. Plaintiff further admits that she did not file a charge of employment discrimination with the EEOC until April 4, 1990, more than 300 days after Joyce was hired. American League 3(g) Stmt. ¶ 5. Accordingly, any claim Plaintiff might have arising from the Joyce hiring is time-barred, and the American League is entitled to summary judgment.

###### b. *Events during the 300 days prior to Plaintiff's EEOC filing*

The American League maintains that it is also entitled to summary judgment on

---

**2.** By its notice of motion, Triple–A joins in the American League's motion for summary judgment on Plaintiff's Title VII claim. Triple–A has not, however, complied with Local Rule 3(g), and this failure alone warrants denial of its motion. *See* S.D.N.Y.Civ.R. 3(g). Furthermore, Triple–A has not filed any affidavits in support of its motion. A movant for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion" and identifying which materials "demonstrate the absence of genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 [106 S.Ct. 2548, 2553, 91 L.Ed.2d 265] (1986). Accordingly, Triple–A's motion for summary judgment is denied.

Plaintiff's claims which accrued during the 300 days prior to her EEOC filing and which are therefore timely. The American League argues that because it did not hire or promote any umpires during that period, the absence of a vacancy for the position sought prevents Plaintiff from establishing her requisite prima facie case of employment discrimination.

In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court ruled that an individual Title VII plaintiff must carry the initial burden of proof by establishing a prima facie case of discrimination. On the specific facts there involved, the Court found that the burden was met by showing that a qualified applicant, who was a member of a protected group, had unsuccessfully sought a job for which there was a vacancy and for which the employer continued thereafter to seek applicants with similar qualifications. *Id.* at 802, 93 S.Ct. at 1824. The American League argues that because there was no vacancy in the position sought by Plaintiff, she is unable to satisfy the *McDonnell Douglas* test, and she therefore cannot establish a prima facie case.

*McDonnell Douglas* does not, however, outline the only possible way a Title VII plaintiff can establish a prima facie case. Indeed, in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977), the Court noted:

> The importance of *McDonnell Douglas* lies, not in its specification of the discrete elements of proof there required, but in its recognition that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on discriminatory criterion illegal under the [Civil Rights] Act [of 1964].

Thus, Plaintiff's inability to satisfy the *McDonnell Douglas* test does not bar her Title VII complaint, so long as she may establish a prima facie case by some other method.

Plaintiff relies on *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), and argues that *McDonnell Douglas* is irrelevant because she can establish her prima facie case by direct evidence. Specifically, she intends to offer the statements of American League officials Larry Napp and Dick Butler which suggested that Plaintiff would have to outperform male umpires to obtain a position in the major leagues.[3]

In *Thurston,* the plaintiffs challenged a policy whereby vacant positions were created for airline pilots under age 60 who were forced to stop flying, but not for pilots forced into retirement at age 60.[4] The defendant raised the absence of vacancies as a defense, but the Court refused to shield the defendant from liability where the existence of vacancies was due solely to the effect of the discriminatory policy under attack. *Id.* at 121, 105 S.Ct. at 621. The Court noted that because there was direct evidence of discrimination, namely the facially discriminatory policy at issue, the plaintiffs need not satisfy the *McDonnell Douglas* test:

> The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination. The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence."

*Id.* at 121, 105 S.Ct. at 621–22.

Plaintiff's reliance on *Thurston* is, however, misplaced. *Thurston* does not stand for a general proposition that a plaintiff may sue for discrimination in hiring or promotion where there was no vacancy in

---

**3.** Similar statements have been held to constitute direct evidence of discrimination. *See Barbano v. Madison County,* 922 F.2d 139, 141 (2d Cir.1990) (statement by interviewer that he would not consider "some woman" for the position constituted direct evidence of discrimination).

**4.** The plaintiffs in *Thurston* sued under the Age Discrimination in Employment Act, the substantive provisions of which "were derived *in haec verba* from Title VII." The Supreme Court has ruled that interpretations of one statute apply with equal force to the other. *Thurston,* 469 U.S. at 121, 105 S.Ct. at 621.

the position sought and no person, either within or without the protected group, was hired. *Thurston* did not hold, and Plaintiff has not cited any case which holds, that a plaintiff may sue under Title VII for discriminatory hiring or promotion where there was no vacancy in the position sought.[5] As the Supreme Court has explained, "[I]t is a [Title VII] plaintiff's task to demonstrate that similarly situated employees were not treated equally." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 258, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). The essence of a Title VII plaintiff's prima facie case must be differential treatment of similarly situated employees. *Martin v. Citibank, N.A.,* 762 F.2d 212, 216 (2d Cir.1985). Here, where the American League did not hire or promote any umpires during the relevant time period, either male or female, Plaintiff cannot show that she was treated any differently than male applicants, and her complaint does not make out a prima facie case of discrimination in hiring or promotion.

Accordingly, the American League is also entitled to summary judgment on Plaintiff's hiring and promotion claim arising from events which occurred within 300 days of the filing of her EEOC charge.

### 2. Termination Claim

The Complaint alleges that the reason for Triple–A's November 6, 1989 termination of Plaintiff was that the American League and National League were not interested in considering her for employment as a major league umpire. Complaint ¶ 24.

The American League argues that it is entitled to summary judgment on Plaintiff's termination claim because when it expressed a lack of interest in hiring Plaintiff in October 1989, it treated her no differently than it treated male umpires. Martin J. Springstead, the American League's Supervisor of Umpires, states that in October 1989, Edwin L. Lawrence, the Executive Director of BOUD, submitted to him the names of a number of umpires employed by Triple–A, including

Plaintiff's, and inquired whether the American League had a current interest in hiring any of these umpires. Mr. Springstead asserts that he advised Lawrence that the American League had no interest in hiring any of the umpires because it had no vacancies in its umpiring staff. Affidavit of Martin J. Springstead, sworn to on February 27, 1992, ¶¶ 8–9.

Plaintiff's Local Rule 3(g) Statement and an affidavit submitted by Plaintiff's counsel pursuant to Rule 56(f) suggest that in the American League's communications with BOUD in October 1989, the American League did more than simply tell BOUD that it had no umpire vacancies at that time. Rather, Plaintiff raises the possibility that the submission of her name was intended to give the American League an opportunity to express whether it ever intended to hire Plaintiff. *See* Pl. 3(g) Stmt. ¶¶ 1–5. Furthermore, Plaintiff implies that the American League either understood that its expressed lack of interest in Plaintiff would cause her termination by Triple–A, or otherwise intended to encourage Triple–A to terminate Plaintiff. Pl. 3(g) Stmt. ¶¶ 5–8. Plaintiff requests that she be given an opportunity to conduct discovery to explore, *inter alia,* the content and nature of the October 1989 communications between the American League and BOUD. Affidavit of Daniel R. Shulman, sworn to on March 26, 1992, ¶ 2.

The American League was not Plaintiff's employer at the time of her termination. Nevertheless, if Plaintiff shows such involvement by the American League in her termination by Triple–A, then she will allege a violation of Title VII against the American League. "It is clear from the language of the statute that Congress intended that the rights and obligations it created under Title VII would extend beyond the immediate employer-employee relationship." *United States v. Yonkers,* 592 F.Supp. 570, 590 (S.D.N.Y.1984). Where a third-party takes discriminatory action that causes an employer to terminate an em-

---

**5.** *Lowe v. Monrovia,* 775 F.2d 998 (9th Cir.1986), does not support Plaintiff's position because the majority found that there *was* a vacancy in the position for which the plaintiff applied. *Id.* at 1006.

ployee, that third-party may be held liable under Title VII. *Sibley Memorial Hospital v. Wilson*, 488 F.2d 1338, 1341 (D.C.Cir. 1973) (covered employer may not discriminatorily interfere with an individual's employment opportunities with another individual).

Accordingly, Plaintiff will have an opportunity to conduct discovery to determine whether the American League was involved in her termination. The American League's motion for summary judgment on Plaintiff's termination claim is therefore denied without prejudice to its renewal after discovery has been completed.

### B. *Motion to Strike Jury Demand and Prayer for Compensatory and Punitive Damages*

■ On November 21, 1991, President Bush signed into law the Civil Rights Act of 1991 (the "1991 Act"), Pub.L. No. 102–166, 102 Stat. 1071 (1991) (to be codified at 42 U.S.C. § 2000e *et seq.*). The 1991 Act amended the Civil Rights Act of 1964, *inter alia*, to grant Title VII plaintiffs the right to trial by jury and the right to seek compensatory and punitive damages in cases of intentional employment discrimination. 1991 Act, § 102(b)–(c). Defendants move to strike Plaintiff's request for a jury trial and prayer for compensatory and punitive damages on the ground that the 1991 Act should not be applied retroactively to conduct which occurred prior to the date of its enactment.

In *Wisdom v. Intrepid*, No. 91 Civ. 4439, 1992 WL 168224, 1992 U.S.Dist. LEXIS 9424 (S.D.N.Y. June 26, 1992), this Court ruled that the damage and jury trial provisions of the 1991 Act should be applied

retroactively to a case that was filed before the passage of the 1991 Act, and that complained of conduct that occurred prior to the passage of the Act. Here, Plaintiff also complains of conduct that occurred prior to the passage of the Act, but her action was commenced after the Act's passage. Therefore, the case for retroactivity here may be even stronger than it was in *Wisdom*. *See Wisdom*, 1992 WL 168224, at *7 n. 5, 1992 U.S.Dist. LEXIS, at *8 n. 5 (citing *Luddington v. Indiana Bell Telephone Co.*, 966 F.2d 225, 227 (7th Cir. 1992)).[6]

In *Wisdom*, this Court noted the apparent tension between two lines of Supreme Court case law which address the retroactive application of statutes. In *Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), the Court ruled that a statute could be applied to conduct pre-dating its enactment, reasoning that "a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is statutory direction or legislative history to the contrary." Accord *Thorpe v. Housing Authority of Durham*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). In *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), however, the Court endorsed the opposite rule, holding that "congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."

■ In *Wisdom*, 1992 WL 168224, at *4, 1992 U.S.Dist. LEXIS, at *13–14, this Court declined to "read the tea leaves" and pre-

---

**6.** In *Luddington*, the court considered whether the Act should be applied retroactively to a case on appeal from the district court's order granting summary judgment. The court ruled that "the new act is applicable only to conduct engaged in after the effective dates (plural because several sections carry different effective dates) in the act, at least if the suit had been brought before the effective date." 966 F.2d at 239–40. That language, however, insofar as it applies to a case such as the instant one, which is still in its initial pre-trial stage in the district court, is dictum.

Furthermore, at issue in *Luddington* was the retroactivity of the provision of the 1991 Act which overturned the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). That provision is clearly substantive insofar as it expands the definition of conduct actionable under § 1981. Here, by contrast, at issue is the retroactivity of provisions of the 1991 Act which are clearly remedial and procedural in nature.

dict that the Supreme Court would overrule the *Thorpe–Bradley* line of cases. Reasoning that it is not within the province of lower courts to determine when decisions in one line of cases effectively overrule Supreme Court decisions in another line of cases, the Court instead adopted an analysis under which the tension between the two lines of cases could be reconciled. The Court determined that absent a clear legislative intent, where a new statute effects procedural or remedial changes, the trial court should apply those changes retroactively. Where substantive legislation is involved, however, the court should apply the legislation only prospectively. This Court found that the jury trial and damage provisions of the 1991 Act were procedural and remedial respectively and applied them retroactively. *Wisdom,* 1992 WL 168224, at \*5–6, 1992 U.S.Dist. LEXIS, at \*17–19. The same provisions of the Act found procedural and remedial in *Wisdom* are at issue in the instant case, thus warranting a similar decision.

The Court therefore adheres to its prior determination not to predict which line of cases the Supreme Court will follow. The Supreme Court has specifically admonished the courts of appeal not to engage in such guesswork, and this warning applies with equal if not greater force to the district courts. *See Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989).

Furthermore, respect for the values embodied in the phrase "rule of law" compels the district courts to follow precedent as set forth by the Supreme Court and by the court of appeals for the relevant circuit. When a court rules on the basis of prediction of what the Supreme Court will do rather than on precedent, it encourages the perception that decisions of the Supreme Court are based on personal views of the individual members of the Court, and not on analysis of the plain meaning of statutes, legislative history, and legal precedent, *i.e.* the common law. Thus, engaging in prediction tends to lessen the respect for the Supreme Court as an institution and to increase the risk of public rejection of its decisions. As the Supreme Court has recently observed in the context of a discussion of *stare decisis,* "[T]he very concept of the rule of law underlying our own Constitution requires such continuity over time that a respect for precedent is, by definition, indispensable." *Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2808, 120 L.Ed.2d 674 (June 29, 1992) (citing Powell, *Stare Decisis and Judicial Restraint,* 1991 J.Sup.Ct.Hist. 13, 16).

Accordingly, based on the legal precedents contained in the Supreme Court decisions discussed in *Wisdom,* the Court concludes that the provisions of the 1991 Act at issue here should apply retroactively. Defendants' motions to strike are denied.

## II. CLAIMS UNDER NEW YORK HUMAN RIGHTS LAW

### A. Subject Matter Jurisdiction

New York's Human Rights Law contains an election of remedies provision which states:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages and such other remedies as may be appropriate, unless such person had filed a complaint hereunder with any local commission on human rights, ... provided that, where the division has dismissed such complaint for administrative convenience, such person shall maintain all rights to bring suit as if no complaint had been filed.

N.Y.Exec.L. § 297(9). Plaintiff filed charges of discrimination with the EEOC against the American League and the National League, and the EEOC in turn referred Plaintiff's complaints to the New York State Division of Human Rights ("SDHR"). Shulman Aff., Exhs. A–B. Plaintiff also filed an EEOC charge against BOUD, and the EEOC filed the charge with the St. Petersburg Human Relations Department ("St. Petersburg HRD"), a local

commission on human rights. BOUD 3(g) Stmt. ¶¶ 1–2.[7]

Defendants maintain that because Plaintiff filed complaints with local commissions on human rights, the election of remedies provision divests this Court of subject matter jurisdiction. Plaintiff notes that she did not file any complaints with the SDHR or the St. Petersburg HRD. Rather, the EEOC referred her complaints to those local commissions. Therefore, because she made no meaningful election of remedies, she argues that her claims should not be barred by § 287(9).

In *Scott v. Carter–Wallace, Inc.*, 147 A.D.2d 33, 541 N.Y.S.2d 780 (1st Dep't 1989), *appeal dismissed*, 75 N.Y.2d 764, 551 N.Y.S.2d 903, 551 N.E.2d 104 (1989), the court noted that a jurisdictional anomaly results when a plaintiff attempts to sue under both Title VII and the Human Rights Law. Title VII requires the plaintiff first to file with a state or local anti-discrimination commission. The election of remedies provision of the Human Rights Law, however, provides that such a filing bars later suit in a judicial forum. *Id.* 541 N.Y.S.2d at 782. Despite this anomaly, the court specifically rejected the argument that the plaintiff himself, and not the EEOC, must file with the state or local commission to constitute a valid election of remedies under § 297(9). *Id.* at 782–3. *Accord Promisel v. First American Artificial Flowers, Inc.*, 943 F.2d 251, 257 (2d Cir.1991) (under New York law, EEOC's automatic referral of a discrimination complaint to the SDHR "is deemed to exercise plaintiff's option for an administrative forum," and bars plaintiff from pursuing the claim in a judicial forum), *cert. denied*, — U.S. ——, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992); *Cholewa v. New York News Inc.*, No. 89 Civ. 4929, 1991 WL 198731, 1991 U.S.Dist. LEXIS 13253 (S.D.N.Y. Sept. 23, 1991). Accordingly, Plaintiff's argument that she did not elect an administrative remedy is rejected.[8]

█ Plaintiff maintains that regardless of whether she elected an administrative remedy, her Human Rights Law claims against the American League and National League should not be barred because those claims fall within § 297(9)'s express exception for dismissals for administrative convenience. In support thereof, she attaches copies of the SDHR's May 1, 1992 "Administrative Convenience Dismissal" of her American League and National League complaints. Affidavit of Gregory Merz, sworn to on April 6, 1992, Exhs. A–B.

Defendant notes that the SDHR sent Plaintiff letters dated May 22, 1990 acknowledging its receipt from the EEOC of Plaintiff's complaints against the National League and American League. Those letters advised Plaintiff that her complaints would be kept on file by the SDHR until the EEOC reported the results of its investigation. After notification of the EEOC's determination, Plaintiff was required to notify the SDHR whether: (1) having received an unfavorable EEOC determination, she wished to provide newly discovered information to the SDHR; or (2) having received a favorable EEOC determination, she wished to proceed to a public hearing before the SDHR. If Plaintiff failed to notify the SDHR of her intentions within the 30–day period, her complaints would be administratively closed. Shulman Aff., Exhs. A–B.

Plaintiff received the EEOC's unfavorable determination of her complaints on October 21, 1991. Complaint ¶ 1. Defendants assert, and Plaintiff does not deny, that Plaintiff did not contact the SDHR until March 23, 1992, long after the 30–day period expired. By letter of that date, Plaintiff's attorneys wrote to the SDHR

7. Triple–A has not shown that Plaintiff filed a charge against it with a local commission on human rights. Accordingly, its motion to dismiss based on § 297(9) must be denied.

8. On July 15, 1991, § 297(9) was amended to provide, "A complaint filed by the [EEOC] to comply with the requirements of 42 U.S.C. § 2000e–5(c) shall not constitute the filing of a complaint within the meaning of this subdivision." The statute expressly provided that the amendment "shall take effect immediately and shall apply to complaints filed with any federal commission on human rights on or after such date." Accordingly, because Plaintiff filed her EEOC charges prior to July 15, 1991, she may not benefit from the amendment.

requesting dismissals for administrative convenience to permit the instant lawsuit. American League Reply Mem. at 13–14. Thus, Defendants argue that the Court should find the SDHR's administrative convenience dismissals void because (1) the dismissals were obtained solely to allow the instant litigation, and (2) the SDHR reopened Plaintiff's cases that were, or should have been, administratively closed merely to effect dismissals for administrative convenience.

In *Drummer v. DCI Contracting Corp.*, 772 F.Supp. 821 (S.D.N.Y.1991), the court rejected the defendant's argument that a dismissal for administrative convenience obtained by the plaintiff solely to permit it to pursue judicial relief was arbitrary and therefore void. The court determined that the applicable New York regulation specifically endorses dismissal for administrative convenience where such dismissal is obtained solely to permit the plaintiff to pursue a judicial action.[9] *Id.* at 830. *Accord Realmuto v. Yellow Freight Systems, Inc.*, 712 F.Supp. 287, 290–91 (E.D.N.Y.1989) (administrative convenience dismissal was proper where plaintiff requested dismissal so that he could bring judicial action).

As for Defendants' argument that the SDHR's opening of a closed complaint simply to effect a dismissal for administrative convenience is arbitrary, Defendants cite no regulation, statute, or case law in support of their position. The applicable regulation provides that the SDHR has "unreviewable discretion" to dismiss a complaint for administrative convenience prior to a public hearing. 9 NYCRR § 465(d)(2)(vi)(1). Thus, the State has mandated that courts defer to the SDHR's determinations in this area.

Accordingly, the Court has jurisdiction over Plaintiff's Human Rights Law claims

against Triple–A, the American League and the National League. Because Plaintiff has not shown that her complaint filed with the St. Petersburg HRD was dismissed for administrative convenience, the EEOC's filing of that complaint bars the prosecution of Plaintiff's Human Rights Law claim against BOUD.

### B. *Motion to Strike Jury Demand and Prayer for Punitive Damages*

Defendants move to strike Plaintiff's demand for trial by jury and prayer for punitive damages with respect to her Human Rights Law claims.

 It is well settled that there is a right to a trial by jury under the Human Rights Law. *See Scott,* 541 N.Y.S.2d at 781; *O'Brien v. King World Productions, Inc.,* 669 F.Supp. 639, 641–42 (S.D.N.Y. 1987). Punitive damages are not, however, available under the statute. *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176 (2d Cir. 1992). *Accord Conan v. Equitable Capital Management Corp.,* 774 F.Supp. 209 (S.D.N.Y.1991).

Accordingly, as to Plaintiff's Human Rights Law claims, the motion to strike Plaintiff's jury demand is denied, and the motion to strike the prayer for punitive damages is granted.

### III. RESTRAINT OF TRADE CLAIMS

Defendants move to dismiss Plaintiff's state law restraint of trade claims for lack of subject matter jurisdiction and for failure to state a claim, arguing that the claims are preempted by baseball's exemption to antitrust law.

The Supreme Court created the so-called "baseball exemption" in *Federal Baseball Club, Inc. v. National League of Professional Baseball Clubs,* 259 U.S. 200, 42 S.Ct. 465, 66 L.Ed. 898 (1922). The plain-

---

**9.** 9 New York Codes Rules and Regulations ("NYCRR") § 465(d)(2)(vi) provides:
(1) If the division finds that ... noticing the complaint for hearing would be ... undesirable, the division may, in its unreviewable discretion at any time prior to the taking of testimony at a public hearing ..., dismiss the complaint on grounds of administrative convenience.

(2) The grounds for dismissal of a complaint for administrative convenience may include, but not be limited to, the following:
(vi) the complainant has initiated or wants to initiate ... court action based on the same grievance.

tiff baseball club had refused to sign an agreement between the two major leagues and found itself without teams to play. It sued under the Sherman Act charging that the two leagues had conspired to monopolize the baseball business by means of the league structure and the "reserve system."[10] In an opinion by Justice Holmes, the Court ruled that exhibitions of baseball were purely state affairs and were not trade or commerce in the ordinary use of those words. Thus, because the baseball did not operate in interstate commerce, it was not subject to the Sherman Act. *Id.* at 208–209, 42 S.Ct. at 465–66.

The Court revisited the baseball exemption in *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64 (1953), this time in the context of a suit by major league players against team owners and the Commissioner of Baseball for antitrust violations. The players alleged that the reserve clauses in their contracts and the nationwide agreements among clubs in the various leagues created a monopoly. The Court adhered to *Federal Baseball,* reasoning that congressional inaction for 30 years after that decision indicated that Congress "had no intention of including the business of baseball within the scope of the federal antitrust laws," and "that if there are evils in this field which now warrant application to it of the antitrust laws it should be done by legislation." *Id.* at 357, 74 S.Ct. at 79.

The *Toolson* Court expressly declined to re-examine the legal basis of *Federal Baseball,* namely that baseball did not affect interstate commerce. The Court itself has viewed *Toolson* not as an affirmation of the doctrinal validity of *Federal Baseball,* but rather as "a narrow application of the rule of *stare decisis.*" *United States v. Shubert,* 348 U.S. 222, 230, 75 S.Ct. 277, 282, 99 L.Ed. 279 (1955). Indeed, *Federal Baseball* and *Toolson* have been subject to substantial criticism. Judge Friendly, writ-

ing for the Second Circuit, commented, "We freely acknowledge our belief that *Federal Baseball* was not one of Mr. Justice Holmes' happiest days [and] that the rationale of *Toolson* is extremely dubious ...." *Salerno v. American League of Professional Baseball Clubs,* 429 F.2d 1003, 1005 (2d Cir.1970), *cert. denied,* 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971).

The Supreme Court revisited the baseball exemption once more in *Flood v. Kuhn,* 407 U.S. 258, 284, 92 S.Ct. 2099, 2112, 32 L.Ed.2d 728 (1972). St. Louis Cardinal Curtis Flood sued the Commissioner of Baseball, the presidents of the American and National Leagues, and the owners of the 24 major league teams, alleging antitrust violations after he was traded without consultation to the Philadelphia Phillies in a multi-player deal. The Court found that "professional baseball is a business and it is engaged in interstate commerce," thus removing the foundation of *Federal Baseball.* Nevertheless, the Court ruled that the plaintiff's suit was barred, concluding that the baseball exemption:

> is an aberration that has been with us now for half a century, one heretofore deemed fully entitled to the benefit of *stare decisis,* and one that has survived the Court's expanding concept of interstate commerce. It rests on a recognition and acceptance of baseball's unique characteristics and needs.

*Id.* at 282, 92 S.Ct. at 2112. In light of Congress' long standing acceptance of the exemption, the Court declined to remove baseball's immunity from federal antitrust law. *Id.* at 284–85, 92 S.Ct. at 2112–13.

The Court also addressed the validity of plaintiff's claims under state antitrust law. Judge Cooper of this Court had rejected these claims on the ground that state antitrust regulation would conflict with federal policy and because national "uniformity [is required] in any regulation of baseball and its reserve system." *Flood v. Kuhn,* 316

---

**10.** "The reserve system, publicly introduced into baseball contracts in 1887, *see Metropolitan Exhibition Co. v. Ewing,* 42 F. 198, 202–204 (C.C.S.D.N.Y.1890), centers in the uniformity of player contracts; the confinement of the player to the club that has him under the contract; the assignability of the player's contract; and the ability of the club annually to renew the contract unilaterally, subject to the stated salary minimum." *Flood v. Kuhn,* 407 U.S. 258, 259 n. 1, 92 S.Ct. 2099, 2100 n. 1, 32 L.Ed.2d 728 (1972).

F.Supp. 271, 280 (S.D.N.Y.1970). The Second Circuit affirmed, stating, "[A]s the burden on interstate commerce outweighs the states' interests in regulating baseball's reserve system, the Commerce Clause precludes the application here of state antitrust law." *Flood v. Kuhn,* 443 F.2d 264, 268 (2d Cir.1971). The Supreme Court quoted these statements with approval and affirmed the dismissal of plaintiff's state law claims.

Defendants assert that Plaintiff's common law restraint of trade claims are preempted and therefore barred by the baseball exemption. Plaintiff responds that her claims are not preempted because the baseball exemption is not so broad as to immunize baseball from claims arising from its relationship with its umpires.

In *California v. ARC America Corp.,* 490 U.S. 93, 109 S.Ct. 1661, 104 L.Ed.2d 86 (1989), the Supreme Court considered the preemptive effect of federal antitrust law, specifically of § 4 of the Clayton Act. The Court ruled that the federal law's limitation on recovery to direct purchasers did not preempt state antitrust laws that permitted recovery by both direct and indirect purchasers. In so ruling, the Court noted that federal law will preempt state law in three situations: (1) where there is an express statement by Congress indicating an intention that state law be preempted; or (2) even in the absence of such a statement, where Congress intends that federal law occupy a given field; or (3) where state law conflicts with federal law. *Id.* at 100, 109 S.Ct. at 1664.

Because the baseball exemption results from congressional silence, there has been no express statement by Congress that state law be preempted. *See Flood,* 407 U.S. at 283–84, 92 S.Ct. at 2112–13. It is also clear that Congress has not expressed its intent to occupy the field of anti-trust law. "Congress intended the federal antitrust laws to supplement, not displace, state anti-trust remedies." *ARC America,* 490 U.S. at 102, 109 S.Ct. at 1665. Thus, the only possible basis for preemption is if application of state law in this case would conflict with the baseball exemption.

Because the *Federal Baseball, Toolson,* and *Flood* cases considered the baseball exemption in very limited contexts, *i.e.* with regard to baseball's reserve clause and to its league structure, those opinions give little guidance in determining the breadth of baseball's immunity to antitrust liability. The Court has not specifically determined whether the exemption applies to baseball's conduct outside the domain of league structure and player relations. However, the *Flood* Court stated that the immunity "rests on a recognition and acceptance of baseball's unique characteristics and needs," suggesting that baseball might not be exempt from liability for conduct not touching on those characteristics or needs. *Flood,* 407 U.S. at 282, 92 S.Ct. at 2111–12.

The Wisconsin Supreme Court endorsed a limited view of the baseball exemption in *State v. Milwaukee Braves, Inc.,* 31 Wis.2d 699, 144 N.W.2d 1, *cert. denied,* 385 U.S. 990, 87 S.Ct. 598, 17 L.Ed.2d 451 (1966), wherein it rejected a challenge under Wisconsin antitrust law to baseball's decision to move the Milwaukee Braves to Atlanta. The court found that because the issue touched on league structure, application of state antitrust law would conflict with the baseball exemption. *Id.* 144 N.W.2d at 17. Importantly, however, the court noted:

> We venture to guess that this exemption does not cover every type of business activity to which a baseball club or league might be a party and does not protect clubs or leagues from application of the federal acts to activities which are not incidental to the maintenance of the league structure, but it does seem clear that the exemption at least covers the agreements and rules which provide for the structure of the organization and the decisions which are necessary steps in maintaining it.

*Id.* at 15.

In apparent agreement with the view of *Milwaukee Braves,* numerous courts have found that baseball may be subject to antitrust liability for conduct unrelated to the reserve system or to league structure. For example, in *Henderson Broadcasting Corp. v. Houston Sports Ass'n,* 541

F.Supp. 263 (S.D.Tex.1982), the court explicitly ruled that the exemption did not immunize baseball from liability in a suit brought by a radio station against the owner of the Houston Astros. The court reasoned that "broadcasting is not central enough to baseball to be encompassed in the baseball exemption." [11] *Id.* at 265.

Other courts have applied the antitrust laws to agreements between baseball entities and third parties without even discussing the possibility that the antitrust exemption might apply. *See, e.g., Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir.1981) (contract between players association and baseball card manufacturer), *cert. denied*, 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982); *Nishimura v. Dolan*, 599 F.Supp. 484 (E.D.N.Y.1984) (contract between cable company and New York baseball teams); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 365 F.Supp. 235 (N.D.Cal.1972) (contract between Oakland Athletics and concessionaire), *rev'd other grounds*, 512 F.2d 1264 (9th Cir.1975), *cert. denied*, 459 U.S. 1009, 103 S.Ct. 364, 74 L.Ed.2d 400 (1982). *See also* Steven F. Ross, *An Antitrust Analysis of Sports League Contracts with Cable Networks*, 39 Emory L.J. 463, 474 n. 52 (1990).

It is thus clear that although the baseball exemption does immunize baseball from antitrust challenges to its league structure and its reserve system, the exemption does not provide baseball with blanket immunity for anti-competitive behavior in every context in which it operates. The Court must therefore determine whether baseball's employment relations with its umpires are "central enough to baseball to be encompassed in the baseball exemption." *See Henderson*, 541 F.Supp. at 265.

Defendants rely on *Salerno* and *Moore v. National Association of Professional Baseball Clubs*, No. C78–351 (N.D.Ohio filed July 7, 1976), to support

their argument that the exemption should apply to antitrust claims brought by umpires. *Salerno* concerned an antitrust action brought by two umpires alleging wrongful discharge after they attempted to organize umpires for collective bargaining. After expressing concern whether plaintiffs had a valid claim under the antitrust laws, the court ruled without discussion that the baseball exemption applied. *Salerno*, 429 F.2d at 1004–5. *Salerno*, however, preceded the decision in *Flood*, which anchored the baseball exemption to the sport's "unique characteristics and needs." *Flood*, 407 U.S. at 282, 92 S.Ct. at 2112. Thus, there is a substantial question whether *Salerno* would be decided similarly after *Flood*'s apparent endorsement of a limited view of the exemption.

In *Moore*, slip op. at 3, the court stated that because "professional baseball umpires perform an integral function in 'the business of baseball,'" the baseball exemption bars claims brought by umpires against baseball. *Moore* supports Defendants' position, but, of course, does not bind this Court.

The Court concludes that Defendants have not shown any reason why the baseball exemption should apply to baseball's employment relations with its umpires. Unlike the league structure or the reserve system, baseball's relations with non-players are not a unique characteristic or need of the game. Anti-competitive conduct toward umpires is not an essential part of baseball and in no way enhances its vitality or viability.

Accordingly, because the baseball exemption does not encompass umpire employment relations, application of New York's common law of restraint of trade presents no conflict with the baseball exemption, and Plaintiff's claims are not preempted.

## CONCLUSION

With regard to the Title VII claims: the American League's motion for summary

11. The court implied, however, that an antitrust claim brought by an umpire would be barred by the baseball exemption, stating, "Radio broadcasting is not a part of the sport in the way in which players, *umpires,* and the league structure and the reserve system are." *Henderson,* 541 F.Supp. at 269 (emphasis added).

judgment is granted in part and denied in part, and Defendants' motions to strike the jury demand and prayer for compensatory and punitive damages are denied. With regard to the Human Rights Law claims: BOUD's motion to dismiss is granted, the other Defendants' motions to dismiss are denied, Defendants' motions to strike the jury demand are denied, and Defendants' motions to strike the prayer for punitive damages are granted. Defendants' motions to dismiss the common law restraint of trade claims are denied.

All counsel are ordered to appear for a pre-trial conference in courtroom 302 on July 24, 1992 at 9:00 a.m.

IT IS SO ORDERED.